**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CAMPAIGN FOR TOBACCO-FREE KIDS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION, *et al.*,<br><br>Defendants. | No. 8:26-cv-02767-ABA |

**DEFENDANTS' MOTION TO STAY SUMMARY JUDGMENT BRIEFING AND EXTEND ANSWER DEADLINE**

Plaintiffs in this Administrative Procedure Act (APA) case have filed a premature motion for summary judgment, well before Defendants' default time to answer has run. That departure from the regular course of proceedings is highly inefficient: Defendants have several threshold jurisdictional defenses—including lack of standing—that should be addressed before merits briefing commences, as they would be dispositive of the entire case. Defendants thus respectfully request that the Court stay summary judgment briefing pending resolution of their forthcoming motion to dismiss, for which they also seek a brief extension of time to file, given the press of emergency litigation in other cases.

Plaintiffs' motion is premature for another reason: They acknowledge that this is a record-review case, but the administrative record has not yet been assembled or produced. Indeed, Plaintiffs attempt to reserve the right to amend their summary judgment papers—even *after* Defendants have responded—once the administrative record is produced. Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 20 n.18, ECF No. 22-1 (Pls.' Br.). That is inappropriate. It is black-letter law that, in a case like this, "[t]he task of the reviewing court is to apply the appropriate APA standard of review . . . based on the record *the agency* presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 743-44 (1985) (emphasis added). So, in the alternative, Defendants ask that, at a minimum, summary judgment proceedings be paused while the administrative record is assembled and produced, and that a reasonable briefing schedule—based on that record—be entered. And in all events, any obligation to respond to Plaintiffs' premature motion should be stayed pending resolution of this motion.

Defendants respectfully submit that none of the requested relief would prejudice Plaintiffs. Their summary judgment motion does not address standing at all, and barely describes the challenged policy's alleged harm to Plaintiffs. Pls.' Br. at 12. And despite their attempt to accelerate merits proceedings, they have alleged no irreparable harm, much less sought preliminary relief. Plaintiffs nevertheless oppose this motion.

**RELEVANT BACKGROUND**

Plaintiffs—a collection of public-health groups, a doctor, and a pseudonymous parent—challenge an FDA guidance document (the Guidance) setting out an enforcement-discretion policy for e-cigarettes[1] and nicotine pouches.[2] In short, that document, released on May 8, 2026, explains that FDA generally does not intend to prioritize enforcement action for violations of the Tobacco Control Act's (TCA) premarket review requirement under certain circumstances—as applicable here, where an e-cigarette or nicotine pouch is the subject of a pending premarket application that FDA has both accepted and filed, and in the case of flavored e-cigarettes, where FDA has also determined that

[1] Defendants use the terms "e-cigarette" and "ENDS" interchangeably to refer to any electronic nicotine delivery system, including vapes or vape pens, personal vaporizers, e-cigarettes, cigalikes, e-pens, e-hookahs, e-cigars, and e-pipes that contain nicotine from any source.
[2] FDA, *Enforcement Priorities For Certain New Tobacco Products Marketed Without Premarket Authorization: Guidance for Industry* (May 2026), https://www.fda.gov/media/192403/download.

the application includes the data necessary to evaluate whether the product is appropriate for the protection of the public health.[3]

## I. Prior Litigation

Plaintiffs' motion relies heavily on their analogy of this case to *American Academy of Pediatrics (AAP) v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019), and they contend that the Guidance here "suffers from the same flaws," Pls.' Br. 1. There is much to dispute about that characterization, most of which Defendants will save for later briefing. But for starters, it brushes aside some important context.

In *AAP*, the plaintiffs—including many of the same public-health groups here—challenged a 2017 guidance document that extended the compliance dates for manufacturers to submit premarket applications for various tobacco products, including e-cigarettes and cigars, by three to four years, and stated that FDA did not intend to enforce the requirement that marketed products be authorized while such applications were pending. Defendants vigorously disputed standing and raised other threshold defenses, as they intend to do here. But the court rejected those defenses, vacated the 2017 guidance, and ultimately ordered that premarket applications for covered products be submitted by September 9, 2020.

By that deadline, thousands of applications were submitted—representing more than 6.5 million products—with the vast majority of applications for ENDS products, resulting in a massive backlog. FDA nevertheless worked to resolve them as quickly as resources allowed, and by March 2023, FDA had made determinations on more than 99% of the nearly 26 million products for which

[3] The guidance also identifies certain considerations that could affect enforcement prioritization regarding whether a tobacco product presents a significant public health or safety concern that is greater than generally presented by ENDS or nicotine pouch products or other tobacco products such as lacking child resistant packaging, certain presumptively underage-appealing elements, or high nicotine content.

premarket applications were submitted, including those submitted by the *AAP*-imposed timeline.[4] In the meantime, FDA engaged in aggressive enforcement efforts, with a special focus on counterfeit products and products marketed to youth. In 2024, FDA and the U.S. Department of Justice announced the creation of a federal multi-agency task force to combat the illegal distribution and sale of e-cigarettes.[5] In 2025, FDA and U.S. Customs and Border Protection seized millions of unauthorized e-cigarette products, much of which originated in China.[6] And in September 2025, FDA, together with the U.S. Marshalls Service, DOJ, and ATF, seized over 2 million illegal e-cigarette products.[7] FDA has also issued warning letters to firms regarding unauthorized e-cigarettes with youth-appealing designs and functionalities and to retailers for selling unauthorized youth-popular e-cigarette brands and filed civil money penalty complaints against retailers for selling ENDS products to underaged purchasers.[8]

Since the *AAP* decision, FDA has also faced unrelenting litigation from the other direction—brought not by public health groups, but instead by tobacco manufacturers challenging the agency's

---

[4] *See* FDA, *FDA Makes Determinations On More Than 99% of the 26 Million Tobacco Products For Which Applications Were Submitted* (Mar. 15, 2023), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-makes-determinations-more-99-26-million-tobacco-products-which-applications-were-submitted.

[5] *See* FDA, *Justice Department and FDA Announce Federal Multi-Agency Task Force to Curb the Distribution and Sale of Illegal E-Cigarettes* (June 10, 2024), https://www.fda.gov/news-events/press-announcements/justice-department-and-fda-announce-federal-multi-agency-task-force-curb-distribution-and-sale.

[6] *See* FDA, *HHS, CBP Seize $86.5 Million Worth of Illegal E-Cigarettes in Largest-Ever Operation* (Sep. 10, 2025), https://www.fda.gov/news-events/press-announcements/hhs-cbp-seize-865-million-worth-illegal-e-cigarettes-largest-ever-operation; FDA, *FDA and CBP Seize Nearly $34 Million Worth of Illegal E-Cigarettes During Joint Operation* (May 22, 2025), https://www.fda.gov/news-events/press-announcements/fda-and-cbp-seize-nearly-34-million-worth-illegal-e-cigarettes-during-joint-operation.

[7] *See* U.S. Department of Justice, More Than Two Million Illicit Vaping Products Seized in Nationwide Sweep (Sep. 25, 2025), https://www.justice.gov/opa/pr/more-two-million-illicit-vaping-products-seized-nationwide-sweep.

[8] *See, e.g.,* FDA, *Advisory and Enforcement Actions Against Industry for Unauthorized Tobacco Products* (Aug. 17, 2026), https://www.fda.gov/tobacco-products/compliance-enforcement-training/advisory-and-enforcement-actions-against-industry-unauthorized-tobacco-products.

resolution of premarket applications, and sometimes the lack thereof. For example, manufacturers alleging that their applications were improperly denied have filed 97 petitions for review in the courts of appeals. *See, e.g.*, *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542 (2025). Still others have sought injunctions against enforcement of the premarket review requirement, on the ground that their applications have been pending for longer than the 180-day period set by statute. 21 U.S.C. § 387j(c)(1) (premarket tobacco product application to be resolved "[a]s promptly as possible, but in no event later than 180 days after . . . receipt"); *see, e.g.*, *Helix Innovations LLC v. FDA*, No. 26-199 (N.D. Tex.).

It is against this background that the Guidance here was issued.

## II. May 8 Guidance

The challenged Guidance sets out FDA's "enforcement priorities" for e-cigarettes and nicotine pouches without premarket authorization. Guidance at 1. It begins by noting that, like other FDA guidance documents, it merely represents FDA's "current thinking" on the topic, "does not establish any rights for any person," and "is not binding on FDA or the public." *Id.* It also emphasizes that it does not affect the legal status of any tobacco product: Under the TCA, "new tobacco products may not legally be marketed without premarket authorization," and "[a]ccordingly, all new tobacco products on the market without authorization are illegally marketed products." *Id.* at 2 (footnotes omitted).

With that in mind, the Guidance explains that, for e-cigarettes and nicotine pouches, FDA "does not intend to prioritize enforcement of the premarket authorization requirement" where the product:

- "is subject to an application that is pending, and the application has been accepted and filed or is subject to a supplemental application (sPMTA) that has been accepted and pending for more than 180 days"; and

- "for nontobacco-flavored ENDS products, if FDA has determined that the application also includes data necessary to evaluate whether such product is appropriate for the protection of the public health."

*Id.* (footnotes omitted).

The Guidance explains that, in FDA's experience, many premarket applications have been so "administratively incomplete" that the agency could not accept them or deem them filed. *Id.* Applications falling into the categories above, by contrast, are "more likely to . . . have the information necessary" for the agency to conduct scientific review and determine whether the statutory standard for authorization is met. *Id.* By "not prioritizing these tobacco products for enforcement" while the agency conducts scientific review, FDA is "able to better allocate its enforcement resources." *Id.*

Moreover, the Guidance explains that, even within the categories above, FDA retains discretion to enforce in a variety of circumstances—for example, where a product:

- has a "high nicotine content";
- generates reports of "serious" or a "larger number of . . . adverse experiences" than expected;
- "is a potential fire hazard";
- "lacks child-resistant packaging";
- or bears "certain presumptively underage-appealing elements" such as "depicting a cartoon-like fictional character, disguising its nature as a vaping product, or resembling a children's toy, phone, or gaming platform."

*Id.* at 3. The Guidance also has no effect on FDA's efforts to enforce against counterfeit products, which are highly unlikely to be the subject of a pending premarket application.

In sum, the Guidance concerns just a single provision of the TCA, only two types of products regulated under that provision, and then, only under certain circumstances. Even so, it expressly retains discretion to enforce against products of particular concern.

## ARGUMENT

### I. Summary Judgment Briefing Should Be Stayed Pending Defendants' Forthcoming Motion to Dismiss

This Court has the inherent authority to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). That broad discretion includes the "inherent power to control the sequence in which it hears matters on its calendar." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1207 n.7 (D.C. Cir. 1995). In particular, when two parties present separate motions, the Court may first consider a motion that "addresses a specific and narrow issue" rather than a motion that "encompass[es] issues far broader." *United States v. W. Elec. Co.*, 158 F.R.D. 211, 220 (D.D.C. 1994), *aff'd*, 46 F.3d at 1207 n.7 ("[T]he [district] court's explanation amply supports its exercise of discretion").

In this case, the threshold issues to be presented by Defendants' forthcoming motion to dismiss, as well as the interests of efficiency and judicial economy, make it appropriate for the Court to resolve Defendants' motion to dismiss before beginning proceedings on Plaintiffs' motion for summary judgment. While each of these threshold issues warrants more thorough briefing, Defendants provide a brief overview here.

#### A. Plaintiffs Lack Standing

This case should be dismissed at the outset for lack of standing, as Plaintiffs are not regulated under the TCA and are not cognizably harmed by the Guidance. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing . . . is ordinarily 'substantially more difficult' to establish.").

Although it is Plaintiffs' burden to show standing, and they are surely aware that it would be disputed here, as it was in *AAP*, their summary judgment motion does not address it at all—and could be denied on that basis alone. The closest it comes is a portion of a single sentence, lumped together

with a description of alleged harms to the public more broadly, alleging that "the organizational Plaintiffs" will have to "expend time and resources to update counseling and education efforts to ensure they account for this seismic market shift, while simultaneously impeding the effectiveness of their core work." Pls.' Br. 12. This is precisely the sort of "diversion of resources" or "mission impairment" theory that the Supreme Court rejected in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

In *Alliance*, the plaintiffs, an association of doctors who disagreed with FDA's regulation of mifepristone, argued that they had been "forced" to "expend considerable time, energy, and resources" opposing the agency's decisions, in part through "public advocacy and public education," all "to the detriment of other spending priorities." *Id.* at 394. But the Supreme Court held that "[t]hat argument does not work to demonstrate standing": an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," and then claiming that the agency "has 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id.* Simply put, "[a]n organization cannot manufacture its own standing in that way." *Id.*

Plaintiffs do not acknowledge *Alliance*, much less grapple with its import. But the flaws in their claim to standing were apparent years ago. In *Cigar Association of America v. FDA*, 323 F.R.D. 54 (D.D.C. 2017), a challenge to FDA's regulation of cigars in which many of the public-health groups here sought to intervene, those groups argued that if certain health warnings were invalidated, they would be "compelled to expend additional resources to communicate information to the public that would otherwise appear on the products themselves." *Id.* at 62. The court concluded that the organizations' allegation that they would "have to expend some undefined amount of additional resources if the Rule is vacated" was merely an "abstract injury to [their] interests," *id.* at 62–63, and that their assertion that they would have to "expend additional time and resources counseling patients

about the dangers of tobacco use" was insufficiently concrete to establish standing, *id.* at 65. *Alliance* proves that conclusion correct, and the Court should be guided by it here.[9]

### B. Agency Nonenforcement Decisions Are Presumed Immune from Judicial Review

Even if Plaintiffs could show standing, an "agency's decision not to prosecute or enforce, whether through civil or criminal process, is . . . generally committed to an agency's absolute discretion" and is therefore "presumed immune from judicial review." *Heckler v. Chaney*, 470 U.S. 831, 831–32 (1985). Such decisions involve "a complicated balancing of . . . factors which are peculiarly within [an agency's] expertise," including "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. Indeed, such decisions "resemble[] a prosecutor's constitutional prerogative not to indict—'a decision which has long been regarded as the special province of the Executive Branch.'" *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 459 (D.C. Cir. 2001) (quoting *Chaney*, 470 U.S. at 832); *see also Angelex Ltd. v. United States*, 723 F.3d 500, 502 (4th Cir. 2013) (where agency "actions [a]re committed to agency discretion by law . . . , the district court lack[s] jurisdiction" and "dismissal under Federal Rule of Civil Procedure 12(b)(1)" is required); *United States v. Texas*, 599 U.S. 670, 680 (2023) (explaining that "[i]n light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising [enforcement] policies," that this "complicated balancing process in turn leaves courts without meaningful standards for assessing those policies," and therefore "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions").

[9] *AAP* does not counsel otherwise. To the extent it relied on a "diversion of resources" or "mission impairment" theory, *see* 379 F. Supp. 3d at 478, it cannot survive *Alliance*. And to the extent *AAP* relied on "informational injury," *id.* at 475–77, it is irrelevant: Plaintiffs press no such theory here, and the Guidance would not support one, as it concerns enforcement priorities, not the submission and review of applications.

This presumption controls here. Though it may be overcome where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," *Chaney*, 470 U.S. at 833, *Chaney* itself found that the Federal Food, Drug, and Cosmetic Act (FDCA), of which the TCA is part, provides no such limits: "The Act's enforcement provisions . . . commit *complete discretion* to the Secretary to decide how and when they should be exercised." *Id.* at 835 (emphasis added). Nor could the Guidance "justifiably be found" to reflect a policy "so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 833 n.4. As noted above, the Guidance concerns just a single provision of the TCA, only a subset of two types of products regulated under that provision, and then, applies only under certain circumstances[10]; even so, it expressly retains discretion to enforce against products of particular concern. By any reasonable measure, this is hardly "abdication."

### C. The Guidance Is Not Final Agency Action

Nor is the Guidance final agency action subject to judicial review. *See* 5 U.S.C. § 704; *Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) ("[F]inality under the APA is a jurisdictional requirement."); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 458 (4th Cir. 2004) (noting that the APA's final agency action requirement is a "question of subject matter jurisdiction"). To start, the Guidance is, by its terms, merely FDA's "current thinking" on the topic, not "the 'consummation' of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). Further, given its express recognition that products not prioritized for enforcement remain unlawful to market, it is not a decision "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (citation omitted).

[10] The enforcement prioritization outlined in the Guidance applies only to applications submitted on or after November 4, 2021, and subject to 21 CFR § 1114.27(a) and (b), that successfully completed acceptance and filing review.

As the FDCA and its implementing regulations explain, FDA guidance documents do not establish legally enforceable rights or responsibilities, and do not legally bind the public or the agency. *See* 21 U.S.C. § 371(h)(1)(A); 21 C.F.R. § 10.115(d). The Guidance itself states that "[i]t does not establish any rights for any person," "do[es] not establish legally enforceable responsibilities," and "is not binding on FDA or the public." Guidance at 1. Instead, it merely explains that the agency "does not intend to prioritize enforcement" of a single TCA provision, against a subset of products it applies to, under limited circumstances, *id.* at 2—in essence, when the manufacturers have taken steps to comply with statutory requirements by submitting complete applications, and those applications are under review at FDA. In the meantime, the agency is sensibly focusing its enforcement efforts on others—such as those who have not submitted applications at all, those whose applications are incomplete, and those marketing products to youth or that present particular dangers. *See id.* at 2–3.

Such non-binding enforcement guidance is not final agency action. *See, e.g.*, *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432 (4th Cir. 2010) (finding agency's explanation contained in response to a Frequently Asked Question published in a Reference Guide was not final agency action); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 2000 WL 433072, at *5-*6, *11-*12 (E.D. Va. Mar. 9, 2000), aff'd sub nom., 1 F. App'x 243 (4th Cir. 2001) (finding EPA guidance was not final agency action); *see also Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (explaining that non-legislative rules, such as guidance documents, typically are not final agency action); *Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 24 (D.D.C. 2004) (holding that "non-binding" letter containing "prospective enforcement policies designed to inform the industry and agency personnel regarding how the agency intends to exercise its enforcement discretion" was not final agency action); *BBK Tobacco & Foods, LLP v. FDA*, 672 F. Supp. 2d 969, 975–76 (D. Ariz. 2009) (concluding that FDA guidance documents were not final agency action because no legal consequences flowed from them). A contrary rule would risk

intrusive judicial oversight over executive-branch enforcement decisions any time an agency advised the public about its priorities.

* * *

Again, these threshold issues deserve more complete briefing—and by previewing them here, Defendants do not waive the right to expand on them later or raise others. But as shown above, Defendants' forthcoming motion to dismiss is not just colorable, but compelling, raising significant doubts about the Court's jurisdiction to proceed to the merits at all. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (the "first and fundamental question" for any court "is that of jurisdiction," for "when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause").

Courts commonly defer consideration of motions for summary judgment pending the resolution of motions to dismiss in circumstances like these. *See, e.g.*, *Guilford College v. McAleenan*, 389 F. Supp. 3d 377, 398 (M.D.N.C. 2019) ("[M]otions for summary judgment, particularly in the APA context, should not be granted in the absence of a full administrative record."); *Furniture Brands Int'l Inc. v. U.S. Int'l Trade Comm'n*, 2011 WL 10959877, at *1 (D.D.C. Apr. 8, 2011) ("[St]aying further briefing of the plaintiff's summary judgment motion will allow the parties to avoid the unnecessary expense, the undue burden, and the expenditure of time to brief a motion that the Court may not decide.").[11] The Court should do so here.

[11] *See also, e.g.*, *Freedom Watch v. Dep't of State*, 925 F. Supp. 2d 55, 59 (D.D.C. 2013) ("Not needing more lawyers to spend more time on more briefs on more subjects in order to decide the motion to dismiss, the Court granted the motion to stay [summary judgment briefing.]"); *Angulo v. Gray*, 907 F. Supp. 2d 107, 109 (D.D.C. 2012); *Ticor Title Ins. Co. v. FTC*, 625 F. Supp. 747, 749 n.2 (D.D.C. 1986) (holding in abeyance plaintiff's motion for summary judgment "pending resolution of threshold questions of jurisdiction and justiciability").

## II. The Court Should Also Extend Defendants' Answer Deadline

If the Court is inclined to stay summary judgment briefing pending the resolution of Defendants' forthcoming motion to dismiss, Defendants additionally request a short extension of their deadline to file a motion to dismiss.

To start, there is some ambiguity as to Defendants' answer deadline. The initial summons filed on the docket in this case indicate that Defendants were served on July 15, 2026, *see* ECF No. 11, but the docket also indicates that there was a filing error, *see* ECF No. 20, and Plaintiffs refiled their summons on July 20, 2026, *see* ECF No. 21. Accordingly, although it remains unclear, Defendants believe that their current answer deadline is likely September 14, 2026, although the most recent deadline reflected on the docket is September 18, 2026. *See* ECF No. 21.

Defendants request a short extension of this deadline until October 9, 2026, because of the press of emergency litigation in other cases and the schedule of counsel. Undersigned counsel was recently assigned to this case, and counsel's time has been consumed by litigating a complex preliminary injunction motion where the Court ordered expedited supplemental briefing in advance of the hearing held this past week. Counsel also had to prepare for and travel to that hearing, and expects that she will be required to continue litigating those issues on an expedited basis. Counsel also has several upcoming deadlines in other matters. Further, counsel has a family obligation and will be unavailable from October 2-6.

As explained, Plaintiffs' motion does not contend that Plaintiffs are suffering irreparable harm, so Defendants do not believe that Plaintiffs will be prejudiced by this short extension.

## III. In the Alternative, the Court Should Pause Summary Judgment Proceedings Pending Assembly and Production of the Administrative Record

Plaintiffs' summary judgment motion is in any event premature, as it turns on APA issues, yet "Defendants have not yet produced the administrative record." Pls.' Br. 20 n.18. Thus, at a bare

minimum, the Court should pause summary judgment proceedings while the administrative record is assembled and produced, and establish a reasonable briefing schedule based on that record.

In a case challenging agency action, the "focal point" of this Court's review is the administrative record compiled by the agency. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). And while Plaintiffs "do not expect that the administrative record will change the analysis of their arbitrary and capricious claim," Pls.' Br. 20 n.18, their assumptions about what the record may or may not contain cannot substitute for the agency's compilation and certification of it. *See Fla. Power*, 470 U.S. at 743–44 (reviewing court must "apply the appropriate APA standard review . . . based on the record *the agency* presents" (emphasis added)). Of course, if the Court accepts Defendants' threshold arguments, there would be no need for a record at all, which is yet another reason to stay summary judgment briefing for the time being. But if the Court declines to permit Defendants to raise their jurisdictional objections before summary judgment briefing commences, it should at least pause that briefing to allow the record to be produced.

Curiously, Plaintiffs attempt to "reserve the right to supplement their argument as appropriate once Defendants produce the record." Pls.' Br. 20 n.18. That is at odds with ordinary party-presentation principles and fundamental fairness. Plaintiffs should not be permitted to file a premature summary judgment motion, then review both Defendants' response and the administrative record, and then file some sort of amended summary judgment brief supplementing their arguments—all before Defendants' deadline to respond to the complaint has even run.

The Court should avoid the complications caused by Plaintiffs' premature motion by staying summary judgment briefing pending resolution of Defendants' forthcoming motion to dismiss. But if it does not, it should at least prevent giving Plaintiffs multiple bites at the apple, and should streamline the process of resolving this matter. Defendants propose that the Court establish a timetable for the production of the administrative record, followed by a four-brief summary judgment

schedule that would permit Plaintiffs to file an amended motion for summary judgment based on the administrative record. Defendants further propose that the parties confer and submit proposed dates for that briefing schedule within seven (7) days of the Court's ruling on this stay motion.

## IV. Defendants' Deadline to Respond to Plaintiffs' Summary Judgment Motion Should At Least Be Extended Until 21 Days After the Court Rules on the Present Stay Motion

In all events, for the avoidance of doubt, any obligation for Defendants to respond to Plaintiffs' summary judgment motion should be stayed pending resolution of this motion, and extended until at least 21 days after the Court's ruling. Under the default response time set by the Local Rules, Defendants' current deadline to respond to Plaintiffs' motion for summary judgment is next Friday, September 11, 2026—well in advance of both Defendants' answer deadline (September 14 or 18) and any opposition from Plaintiffs to this motion for stay (September 18).

## CONCLUSION

The Court should stay summary judgment briefing pending resolution of Defendants' motion to dismiss, and permit Defendants to file that motion by October 9, 2026.

Dated: September 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC B. BECKENHAUR
Assistant Branch Director

*/s/ Taylor Pitz*
TAYLOR PITZ
CA Bar No. 332080
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Phone: (202) 305-5200
E-mail: taylor.n.pitz@usdoj.gov