**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CAMPAIGN FOR TOBACCO-FREE KIDS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION, *et al.*,<br><br>*Defendants*. | Case No. 8:26-cv-02767-ABA |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

ARGUMENT .......... 1

I. Plaintiffs' Challenges to the Guidance Are Justiciable .......... 1

A. Plaintiffs Have Standing to Bring Their Claims .......... 1

1. Injury in Fact .......... 2

a. Organizational Plaintiffs .......... 2

b. Pediatrician Plaintiffs .......... 9

c. Jane Doe .......... 10

2. Causation .......... 12

3. Redressability .......... 12

B. The Guidance Is Not the Exercise of Unreviewable Agency Discretion .......... 15

C. The Guidance Is Reviewable Final Agency Action .......... 17

II. The 2026 Guidance Is Contrary to Law and Arbitrary and Capricious in Violation of the APA .......... 21

A. The Guidance Is Inconsistent with the TCA .......... 21

B. FDA Provides No Reasonable Explanation of the Criteria for Its Enforcement Safe Harbor .......... 22

C. The Guidance Provides No Reasonable Explanation for Changing Its Prior Policy on Unauthorized Flavored Products .......... 24

D. The Guidance Provides No Reasonable Explanation for the Change in FDA's Interpretation of Its Statutory Authority .......... 27

III. The Guidance Violates the APA's Notice-and-Comment Requirements and FDA's Statutory and Regulatory Public Participation Requirements .......... 29

A. Notice and Comment Was Required .......... 29

B. Prior Public Participation Was Required .......... 31

IV. The 2026 Guidance and Public List Are *Ultra Vires* .......... 32

V. Defendants' Arguments About Remedy Are Meritless .......... 33

CONCLUSION .......... 35

## TABLE OF AUTHORITIES

### Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
988 F.2d 146 (D.C. Cir. 1993) ........ 33, 34

*Allina Health Care Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ........ 34

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
796 F. Supp. 3d 66 (D. Md. 2025) ........ 35

*American Academy of Pediatrics v. FDA*,
379 F. Supp. 3d 461 (D. Md. 2019) ........ 1, 2, 6, 8, 17, 18, 19, 22, 27, 28, 29

*American Academy of Pediatrics v. FDA*,
399 F. Supp. 3d 479 (D. Md. 2019) ........ 27

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ........ 17, 30

*Appalachian Voices v. Tenn. Valley Auth.*,
--- F.4th ----, 2026 WL 3093507 (6th Cir. Oct. 16, 2026) ........ 34

*Apter v. HHS*,
80 F.4th 579 (5th Cir. 2023) ........ 33

*Ass'n of Flight Attendants-CWA v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ........ 29, 30

*Associated Dry Goods Corp. v. EEOC*,
720 F.2d 804 (4th Cir. 1983) ........ 29

*Asylum Seeker Advoc. Project v. USCIS*,
808 F. Supp. 3d 708 (D. Md. 2025) ........ 35

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 17

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ........ 24, 27

*Campaign Legal Ctr. & Democracy 21 v. FEC*,
952 F.3d 352 (D.C. Cir. 2020) ........ 6

*Campaign Legal Ctr. v. FEC*,
31 F.4th 781 (D.C. Cir. 2022) ........ 6

*Child Trends, Inc. v. U.S. Dep't of Educ.*,
795 F. Supp. 3d 700 (D. Md. 2025) ........ 35

*Cigar Ass'n of Am. v. FDA*,
323 F.R.D. 54 (D.D.C. 2017) ........ 8, 9

*City of Columbus v. Kennedy*,
796 F. Supp. 3d 123 (D. Md. 2025) ........ 35

*City of Fredericksburg v. FERC*,
876 F.2d 1109 (4th Cir. 1989) ........ 31

*Competitive Enter. Inst. v. NHTSA*,
901 F.2d 107 (D.C. Cir. 1990) ........ 14

*Conservation Law Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) ........ 11

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) ........ 33

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ........ 9

*Ctr. for Taxpayer Rts. v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) ........ 6

*Deal v. Mercer Cty Bd. Of Educ.*,
911 F.3d 183 (4th Cir. 2018) ........ 14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 12

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 15, 16

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) ........ 14

*Doctors for Am. v. Office of Personnel Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ........ 6-7, 9-10

*Doe v. Tenenbaum*,
900 F. Supp. 2d 572 (D. Md. 2012), *rev'd on other grounds*, *Co. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014) ........ 16-17

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) ........ 7

*Equity in Athletics, Inc. v. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) ........ 9, 13

*Erwin v. FAA*,
21 F.4th 154 (D.C. Cir. 2021) ........ 14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 25

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 21

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .......... 1, 4, 6, 7, 8, 10

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) .......... 7, 26

*FEC v. Akins*,
524 U.S. 11 (1998) .......... 6

*Florida v. HHS*,
No. 25-12095, 2026 WL 2618386 (11th Cir. Sept. 4, 2026) .......... 35

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
857 F. Supp. 1137 (M.D.N.C. 1994) .......... 19

*Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) .......... 19

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 18

*Gen. Elec. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) .......... 17, 19

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 1, 4, 6, 7, 8

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) .......... 33-34

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 15, 16

*Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) .......... 14

*Kenny v. Wilson*,
885 F.3d 280 (4th Cir. 2018) .......... 2

*Knox v. U.S. Dep't of Interior*,
759 F. Supp. 2d 1223 (D. Idaho 2010) .......... 10, 11

*Laufer v. Naranda Hotels, LLC*,
60 F.4th 156 (4th Cir. 2023) .......... 6

*Lowy v. Daniel Def., LLC*,
167 F.4th 175 (4th Cir. 2026) .......... 12

*Make the Road N.Y. v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .......... 35

*McLouth Steel Prods. Corp. v. Thomas*,
838 F.2d 1317 (D.C. Cir. 1988) ........ 30

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 7, 24, 25, 26, 27

*N.C. Growers' Ass'n v. United Farm Workers*,
702 F.3d 755 (4th Cir. 2012) ........ 31

*N.J. Dep't of Env'tl Prot. v. EPA*,
626 F.2d 1038 (D.C. Cir. 1980) ........ 31

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ........ 33, 34

*National Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2019) ........ 19, 20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) ........ 33

*Nat'l Parks Conservation Ass'n v. Semonite*,
422 F. Supp. 3d 92 (D.D.C. 2019) ........ 34

*NicQuid, LLC v. FDA*,
188 F.4th 790 (5th Cir. 2026) ........ 35

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) ........ 35

*Ohio v. EPA*,
603 U.S. 279 (2024) ........ 21

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ........ 7, 8, 10

*Philip Morris v. FDA*,
202 F. Supp. 3d 31 (D.D.C. 2016) ........ 17, 18

*Pub. Citizen Health Rsch. Grp. v. Acosta*,
363 F. Supp. 3d 1 (D.D.C. 2018) ........ 14

*Pub. Citizen v. FTC*,
869 F.2d 1541 (D.C. Cir. 1989) ........ 10, 11

*R J Reynolds Tobacco Co. v. FDA*,
189 F.4th 432 (5th Cir. 2026) ........ 35

*Repub. Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ........ 3, 4, 6

*Rhea Lana, Inc. v. Dep't of Lab.*,
824 F.3d 1023 (D.C. Cir. 2016) ........ 17

*Rise for Animals v. Washington*,
No. 24-1458, 2025 WL 2049056 (4th Cir. July 22, 2025)............ 7

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
797 F. Supp. 3d 440 (D. Md. 2024)............ 33, 34

*Sierra Club v. U.S. Army Corps of Eng'rs.*,
909 F.3d 635 (4th Cir. 2018)............ 33

*Sorrell v. Paige Indus. Servs., Inc.*,
No. 21-7062, 2022 WL 684295 (D.C. Cir. Feb. 11, 2022)............ 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)............ 34

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)............ 32

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026)............ 32

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019)............ 17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)............ 11

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)............ 34, 35

*United States v. Texas*,
599 U.S. 670 (2023)............ 2, 13, 16

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)............ 22

**Statutes**

5 U.S.C.
§ 552............ 5, 7
§ 553............ 29
§ 704............ 17
§ 706............ 5, 7, 32, 35

21 U.S.C.
§ 371............ 31, 32
§ 387 note............ 7
§ 387j............ 5, 7, 29, 32

Pub. L. No. 111-31, 123 Stat. 1776............ 7

Code of Ala. § 28-11-17.1............ 20

A.C.A. § 20-65-204 .... 20

La. R.S. § 26:926.1 .... 20

Miss. Code Ann. § 75-102-2 .... 20

N.C. Gen. Stat. § 143B-245.11 .... 20

S.C. Code Ann. § 44-95-65 .... 20

Tenn. Code Ann. 67-4-1034 .... 20

**Regulations**

21 C.F.R.
§ 10.115 .... 31
§ 20.20 .... 7
§ 1114.5 .... 29

Premarket Tobacco Product Applications and Recordkeeping Requirements, 86 Fed. Reg. 55,300 (Oct. 5, 2021) .... 26

**Other Authorities**

FDA, Import Alert 98-07 (Sep. 18, 2026), https://perma.cc/8SY3-PWBK .... 20, 30

Seeking Alpha, *Philip Morris International Inc. (PM) Presents at 23rd annual dbAccess Global Consumer Conference Transcript* (June 2, 2026), https://perma.cc/YE5G-QH45 .... 12

## INTRODUCTION

In their opening brief, Plaintiffs showed that the 2026 Guidance rewrites the statutorily mandated premarket review process, creating a pathway through which manufacturers can apply for permission to market unlawful tobacco products and receive a public assurance that those products can remain on the market without FDA interference, in violation of the Tobacco Control Act. And Plaintiffs demonstrated that this represents a dramatic reversal of FDA's long-standing conclusions and positions, without any justification in the Administrative Record and without required notice-and-comment procedures.

In response, Defendants repeatedly invoke "enforcement discretion," primarily pointing to boilerplate disclaimers that attempt to disguise the actual effect of the Guidance. But no matter how FDA characterizes the Guidance, it cannot insulate the wholesale creation of an extrastatutory pathway to market—striking at the heart of the regulatory scheme constructed by Congress. In *American Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461 (D. Md. 2019) ("*AAP I*"), the court looked beyond FDA's similar claim of enforcement discretion and its supporting boilerplate language, to find unlawful a regulatory "holiday" created by the agency allowing the marketing of new e-cigarettes without the marketing granted orders required by statute. Here, too, the Court should look beyond the boilerplate disclaimers to hold the 2026 Guidance unlawful because it allows e-cigarettes and nicotine pouches to enter the market without the statutorily required marketing granted orders and enjoy an indefinite period of protection from enforcement.

## ARGUMENT

### I. Plaintiffs' Challenges to the Guidance Are Justiciable

#### A. Plaintiffs Have Standing to Bring Their Claims

In *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court reaffirmed that an organization has standing to challenge "perceptibl[e] impair[ments]" to its "core business activities" or mission, including "counseling or referral services." 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). As Judge Grimm found in *AAP I*, that is exactly what happens when FDA determines that tobacco manufacturers can market

unauthorized flavored products without fear of enforcement and without the information that accompanies FDA's authorization orders. *See AAP I*, 379 F. Supp. 3d at 475-78. The resulting proliferation of unauthorized products, unaccompanied by critical public information, will impair the core business activities of Plaintiff organizations.

Defendants' other principal argument is that *United States v. Texas*, 599 U.S. 670 (2023) forecloses any claim related to an enforcement policy. *See, e.g.*, ECF No. 86-1 at 9-10. But their interpretation of *Texas* asks the Court to stop reading before the opinion ends. *Texas* explicitly notes that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." 599 U.S. at 683. Plaintiffs allege that the 2026 Guidance, by allowing unauthorized tobacco products to reach the market and be protected from enforcement for an indefinite period, as reflected on a public list, grants those products a significant legal benefit. *See infra* § I.A.3. Defendants may dispute that on the merits—an argument that they lose, *see infra* § II.B—but even if they were correct, that would not be a *standing* issue.

Defendants also assert that Plaintiffs are not relying on informational injury. ECF No. 86-1 at 12 n.3. This is incorrect: Plaintiffs pleaded such injury in the Complaint, *see, e.g.*, ECF No. 1 at ¶¶ 95-96, and, as their undisputed declaration testimony demonstrates, the entry into the market of new products without the information that normally accompanies a marketing granted order harms the organizational Plaintiffs' ability to provide the counseling and related services that are a core part of their business activities. *See infra* §§ I.1.a-b.

In any event, only one Plaintiff needs standing in order to challenge the Guidance. *See Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). The question is thus not whether *every* Plaintiff has standing, but whether *any* of them do—a question the Court should answer in the affirmative.

1. Injury in Fact

*a. Organizational Plaintiffs*

The Organizational Plaintiffs have standing because the 2026 Guidance perceptibly impairs their ability to perform core business activities, both by increasing the availability and proliferation

of unauthorized products that are the subject of their counseling activities, and by denying them access to information they need to provide those services, thereby undermining their value and effectiveness.

"[W]hen an action perceptibly impairs an organization's ability to carry out its mission and consequently drains the organization's resources, there can be no question that the organization has suffered an injury-in-fact." *Repub. Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-96 (4th Cir. 2024) ("*RNC*") (cleaned up). That is precisely what the Organizational Plaintiffs have shown here through undisputed declaration testimony. Their declarations show that their core business activities include providing "informed and evidence-based education, guidelines, and counseling" to "physicians, local health care clinicians, employers, community groups, and school administrators … to help prevent youth initiation of tobacco use, including e-cigarette and nicotine pouch use, and to encourage tobacco users to quit." Jessup Decl. ¶ 6.[1] The Organizational Plaintiffs produce and provide extensive materials in support of this work, and "[t]he scientific reliability of these … services, resources, and publications depends on [Plaintiffs'] ability to identify the tobacco and nicotine products that are widely available and to obtain sufficiently reliable information about their composition, nicotine delivery, toxicological characteristics, patterns of use, and health effects." *Id.* ¶ 9.[2]

---

[1] *See also, e.g.*, Beers Decl. ¶¶ 21-31 (describing AAP's "expansive portfolio of live, virtual, and on-demand opportunities [for] pediatric clinicians," all of which are "grounded in evidence-based science"); Falk Decl. ¶ 13 ("Truth Initiative offers a free evidence-based, online smoking cessation intervention" that "enrolled nearly 120,000 13–24-year-olds" in the last fiscal year and provides information about e-cigarettes and nicotine pouches as alternatives to cigarettes); Wimmer Decl. ¶ 5 ("The Lung Association expends substantial resources to support its highly acclaimed Freedom from Smoking program, which offers in-person, online, self-help, and telephonic resources to help tobacco and nicotine users quit," along with several other programs); Joyce Decl. ¶ 6 ("Parents Against Vaping offers support and counseling to parents and families suffering from the serious and adverse effects of tobacco product addiction.").

[2] *See also, e.g.*, Beers Decl. ¶ 36 ("In order for AAP to provide support, training, and resources to its members, it must expend resources to understand and evaluate the products their patients are using."); Falk Decl. ¶ 13 ("[W]ithout information about the actual contents and risk profiles of *particular products*, Truth Initiative cannot provide evidence-based information to [its] clients.").

The Guidance will predictably lead to a proliferation of widely available, unauthorized products. That proliferation will undermine Plaintiffs' core business activities: it will harm the ability of the American Heart Association ("AHA") and American Lung Association ("ALA") to provide tobacco cessation services to individuals, employers, and schools. It will impair the American Academy of Pediatrics' ("AAP") core business activity of counseling its member pediatricians on how to treat patients. It will impair Parents Against Vaping's core activity of counseling parents about their children's addiction. The 2026 Guidance and its public list of protected products are no different in their harmful impact than the 2017 Guidance: they will predictably cause unauthorized flavored tobacco products to proliferate on the market without the information that accompanies authorized products, "perceptibly impair[ing] [Plaintiffs'] ability to provide counseling" and related services. *Hippocratic Med.*, 602 U.S. at 396 (quoting *Havens Realty*, 455 U.S. at 379); *see also RNC*, 120 F.4th at 395-97 (explaining and applying *Hippocratic Medicine*).

Organizational Plaintiffs' core activities will be harmed in three primary ways:

First, their materials "will not be as current or complete once numerous unauthorized products enter the market," and "[t]he rapidity with which new unauthorized products may enter the market and the difficulty in tracking the health impacts of these new products on release will make it exceedingly difficult and time-consuming to keep these educational materials up to date." Beers Decl. ¶ 23. This "is not litigation, lobbying, or public-advocacy work," but rather mission-critical work "necessary to maintain the accuracy and usefulness of [Plaintiffs'] programs and resources." *Id.* ¶ 38. Programs that Plaintiffs have already developed and administered will need to be revised and re-done; for example, "the 369 healthcare professionals who have already taken [AHA's Tobacco Cessation Specialist] Certification test would be required to re-take the test, and the 42 healthcare professionals who have paid to take but not yet taken the test will have to delay taking the test until the new version is out." Jessup Decl. ¶ 20.

Second, it makes Plaintiffs' one-on-one counseling—whether of patients, parents, or tobacco users—significantly more challenging. Plaintiffs' "counseling is seriously compromised

when [they] are unable to obtain factual information about widely available products." Wimmer Decl. ¶ 10. "[T]he proliferation of unauthorized products on the market makes it more difficult to advise current tobacco users on harm reduction strategies that are based in science." Falk Decl. ¶ 13. New products occupy a substantial amount of Plaintiffs' counseling work; for example, 10-20% of Truth Initiative's cessation coaching sessions "revolve around answering questions about novel nicotine products such as nicotine pouches." *Id.* ¶ 14.[3]

Third, the Guidance deprives Plaintiffs of information that would otherwise accompany the most prevalent products. To lawfully authorize a product, FDA must issue a marketing granted order finding that "permitting such tobacco product to be marketed would be appropriate for the protection of public health." 21 U.S.C. § 387j(c)(1)(A), (c)(2). Under the APA, FDA must publish its orders, 5 U.S.C. § 552(a)(2)(A), and explain the basis for its conclusions, *id.* § 706(2)(A). For marketing granted orders, it does this through a Technical Product Lead ("TPL") Review and/or Decision Summary. *See* SAR 194-213; AR 478-79.[4] The information in these documents is critical to the evidence-based information and counseling that Plaintiffs provide. As AHA's Chief Science and Medical Officer explains, "[w]hen a product becomes widely available without [this information], AHA cannot evaluate that product through the same established information-gathering and scientific-review process it uses for products that have completed review." Jessup Decl. ¶ 12.[5] To even come close to replicating this information "would require contacting each company whose product is on the list … and asking for the product details, which manufacturers have an incentive not to provide. If the manufacturer does not supply the information, AHA would

---

[3] *See also, e.g.*, Joyce Decl. ¶ 12 ("Because unauthorized flavored products will become more common, more parents will ask PAVe about products that the organization is not familiar with and needs to research.").

[4] TPL Reviews and Decision Summaries are available through the links in the online version of the Searchable Tobacco Products Database, AR 478-79.

[5] *See also, e.g.*, Beers Decl. ¶ 15 ("When FDA has not completed premarket review for a product, AAP and pediatricians generally do not have an FDA marketing-granted order and accompanying scientific review to consult when developing resources or counseling patients about that product.").

have to pay to have each product tested for safety and to identify its contents. Even then, that would not provide all the information included in the FDA's reports." *Id.* ¶ 13.[6]

The Supreme Court, the Fourth Circuit, and other courts routinely recognize such injuries. In *Hippocratic Medicine*, the Supreme Court explicitly reaffirmed *Havens Realty* and its holding that plaintiffs have standing to challenge actions that "perceptibly impair[] [their] ability to provide counseling and referral services." *Hippocratic Med.*, 602 U.S. at 396 (quoting *Havens Realty*, 455 U.S. at 379). Shortly after *Hippocratic Medicine*, the Fourth Circuit held that organizations that "counsel[] interested voters and volunteers on election participation" had standing to challenge "inaction of the State Board in remedying … alleged defects in the voter rolls" that allegedly impaired their "organizational and voter outreach efforts" such as "staffing voting protection hotlines [and] investigating reports of voter fraud and disenfranchisement." *RNC*, 120 F.4th at 397. Similarly, the D.C. Circuit held earlier this year that a tax-counseling organization had standing to challenge actions that made it harder to engage with clients, causing them to divert resources to education and outreach. *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1001 (D.C. Cir. 2026). These injuries are especially well-established where they are caused by government actions that deprive plaintiffs of information that would otherwise be available. As Judge Grimm explained, "this injury to the organizations' daily operations due to agency action limiting their access to the information is the type of injury that courts have recognized as both concrete and particularized." *AAP I*, 379 F. Supp. 3d at 477; *see generally Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 165 (4th Cir. 2023) (injury-in-fact can be caused by "inability to obtain information … that on [plaintiffs'] view of the law, the statute requires that [an entity] make public" (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998))); *see also, e.g.*, *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022) (quoting *Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020)) ("The law is

[6] *See also, e.g.*, Beers Decl. ¶ 35 ("For products covered by the Guidance but not authorized by FDA, [marketing granted orders and accompanying scientific review] do not exist. AAP must therefore devote additional staff and expert time to locating, evaluating, and explaining incomplete or product-specific information in order to maintain the accuracy and clinical usefulness of its existing resources.").

settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them."); *Doctors for Am. v. Office of Personnel Mgmt.*, 766 F. Supp. 3d 39, 48 (D.D.C. 2025) ("The denial of 'information' these doctors 'wish to use in their routine' activities has 'inhibit[ed] ... their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged.'" (quoting *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)) ("*PETA*").

The Tobacco Control Act requires FDA to make findings about individual products that it affirmatively permits, and the APA and FDA's regulations require FDA to disclose and explain them. 21 U.S.C. § 387j(c)(1)(A), (c)(2); 5 U.S.C. §§ 552(a)(2)(A), 706; 21 C.F.R. § 20.20(a) (requiring FDA to "make the fullest possible disclosure of records to the public"); *see, e.g.*, *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (applying "well-worn arbitrary-and-capricious standard" to marketing denial orders, which "ensures that an administrative agency '. . . articulate[d] a satisfactory explanation for its action.'" (quoting *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Congress designed the Tobacco Control Act and the premarket review process "to ensure that consumers are better informed" and have access to "research … related to the health and dependency effects or safety of tobacco products." 21 U.S.C. § 387 note, Pub. L. No. 111-31, at § 3(6), 123 Stat. 1776, 1782. The Organizational Plaintiffs are thus suffering "the type of harm *Congress sought to prevent* by requiring disclosure." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017).[7]

Defendants principally rely on *Hippocratic Medicine*; indeed, it is nearly the only case the government cites in its section on the Organizational Plaintiffs. But as already explained, that case

[7] To the extent Defendants rely on the Fourth Circuit's unpublished decision in *Rise for Animals v. Washington*, No. 24-1458, 2025 WL 2049056 (4th Cir. July 22, 2025), that opinion is distinguishable. The plaintiffs in *Rise* did not allege that the government was "failing to compose or publish final inspection reports publicly," but merely that the published reports were not thorough enough. *Id.* at *6. Here, Plaintiffs argue that FDA is effectively treating unauthorized products as if they were authorized without publishing the statutorily mandated information *at all*.

*reaffirmed* the rule that organizations have standing to challenge actions that "perceptibly impair[] [their] ability to provide counseling and referral services." *Hippocratic Med.*, 602 U.S. at 396 (quoting *Havens Realty*, 455 U.S. at 379). Despite citing *Hippocratic Medicine* repeatedly, the government never acknowledges this language, much less explains how it can be distinguished. *See* ECF No. 86-1 at 10-13. Similarly, even though Defendants acknowledge Plaintiffs' Declarations showing that they provide "counseling and education" among their "core work," ECF No. 86-1 at 10, they instead try to equate Plaintiffs with the advocacy-focused organizations whose standing *Hippocratic Medicine* rejected. But those groups showed only "time, energy, and resources drafting citizen petitions to FDA" and "engaging in public advocacy and public education"—not the impairment of their provision of direct services, like counseling, apart from their advocacy work. *Hippocratic Med.*, 602 U.S. at 394-95. Indeed, the plaintiff groups in *Hippocratic Medicine* based their standing on their advocacy against the specific FDA actions they were challenging in court. *Id.* at 394. Such groups and their advocacy activities are analytically distinct from the *Havens Realty* plaintiff, which "[c]ritically . . . not only was an issue-advocacy organization, but also operated a . . . counseling service." *Id.* at 395.[8]

The government also cites one case in which a court found that several of the Organizational Plaintiffs here lacked standing to intervene in defense of a rule implementing the Act. *See* ECF No. 86-1 at 10-11 (citing *Cigar Ass'n of Am. v. FDA*, 323 F.R.D. 54 (D.D.C. 2017)). But the *Cigar Association* court's decision was based on what it found to be *evidentiary* shortcomings, criticizing "generic statement[s]" and concluding that none of the proposed

[8] This is not to say that there are *no* situations in which organizations that engage in advocacy in addition to other services can establish their standing based on their advocacy, such as when they are denied information that they would use in their advocacy. *See, e.g.*, *PETA*, 797 F.3d at 1094 (holding that plaintiffs have standing to challenge denial of information that impairs their ability to "submit[] USDA complaints" and "educate the public"); *AAP I*, 379 F. Supp. 3d at 476-78. For example, ACS CAN and CTFK can assert informational injury for denial of the "scientific data published by FDA through the premarket review process" that they use to develop and comment on potential tobacco product standards and other regulatory or legislative actions. Harris Decl. ¶¶ 9-14; King Decl. ¶¶ 18-20. Because the harms to Plaintiffs' direct counseling services are even more clearly sufficient under *Hippocratic Medicine*, and the Court only needs to find one plaintiff with standing, there is no need to analyze when impairment of public advocacy is cognizable.

intervenors "has come forward with evidence showing that the Rule would inhibit the organization's daily operations." *Cigar Ass'n*, 323 F.R.D. at 63. Moreover, the only relevant claim when they sought to intervene was a challenge to the rule's warning requirements, *id.* at 59, and the court there held that the proposed intervenors did not connect their allegations to that particular claim, *id.* at 63. *See also id.* at 65 (finding no standing where affiant "makes no mention of any specific aspect of the Rule that is presently at issue [and] says not a word about the warning requirements or how the absence of such warnings would impact AAP's members"). The fact that a court ruled against a party's standing in one case does not mean that the party's standing is insufficient in a wholly separate case with distinct legal issues and standing evidence.

*b. Pediatrician Plaintiffs*

Much the same analysis applies to Dr. Walley and AAP as an association of its 67,000 pediatrician members.[9] *See* Beers Decl. ¶¶ 5, 9, 40-43 (explaining AAP's membership and how the Guidance affects AAP's members). As Dr. Walley explains, if the Guidance leads to the proliferation of widely available unauthorized products, as it is intended to do, she "will either need to spend a significant amount of time researching and learning about those new products, or [her] own clinical efforts and the training [she] provide[s] will both become appreciably less effective because they will no longer be up-to-date based on market realities." Walley Decl. ¶ 21.

Like the Organizational Plaintiffs, pediatricians will suffer "an injury both concrete and specific to the work in which they are engaged": "[t]he denial of 'information' these doctors 'wish to use in their routine' activities" and consequent inhibition of their daily operations. *Doctors for Am.*, 766 F. Supp. 3d at 48 (quoting *PETA*, 797 F.3d at 1094). The government attempts to liken

[9] An organization such as AAP has associational standing as a representative of its members as long as (1) "its members would have standing to sue as individuals; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) . . . the suit does not require the participation of individual members." *Equity in Athletics*, 639 F.3d at 99. Defendants dispute only the first prong. *See, e.g.*, ECF No. 86-1 at 12. The second and third prongs are easily satisfied: Pediatricians' interests in this case are germane to AAP's purpose, *see* Beers Decl. ¶¶ 7-8, and the suit does not require the participation of individual members because it "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [Plaintiffs] seek[] is invalidation of agency action." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

the pediatricians' injuries here to those in *Hippocratic Medicine*, where the Supreme Court rejected a special doctrine of "doctor standing." ECF No. 86-1 at 12. But the fact that doctors do not have a unique status automatically conferring standing does not mean that they lack standing when they meet generally applicable requirements. The *Hippocratic Medicine* doctors did not allege that the challenged action impaired their ability to provide medical services, but only that it required them to treat more patients, derivatively increasing their risk of liability and insurance costs. 602 U.S. at 390. The Supreme Court rejected the proposition that doctors may "challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency room doors or in doctors' offices with follow-on injuries." *Id.* at 391. But that is far different from a government action that impairs a doctor's *ability* to provide services—by, for example, eliminating information that they would use in counseling and treating patients.

As one court explained last year, "*Hippocratic Medicine* hurts defendants more than it helps them, as it suggested that the doctors could have bolstered their standing case there by showing that the challenged action 'caused a resulting diversion of the doctors' time and resources.'" *Doctors for Am.*, 766 F. Supp. 3d at 49 (quoting *Hippocratic Med.*, 602 U.S. at 391). Like anyone else, doctors have standing when a "deprivation of materials" (here, the scientific information that accompanies marketing granted orders) causes "injury (obstacles to treating their patients)." *Id.* That is just the case here.

*c. Jane Doe*

Where government action increases the availability of addictive products and thereby contributes to or exacerbates an individual's addiction, that person (or their parent) has standing to sue. *See, e.g.*, *Pub. Citizen v. FTC*, 869 F.2d 1541, 1550 (D.C. Cir. 1989); *Knox v. U.S. Dep't of Interior*, 759 F. Supp. 2d 1223, 1233-35 (D. Idaho 2010). In *Public Citizen*, for example, the D.C. Circuit held that parents had standing to challenge the government's failure to regulate tobacco products, based on their "own direct, legally cognizable interest in preserving the highest level of health for his or her child." 869 F.2d at 1550. Facilitating "broad dissemination ... with the *aim* of

reaching the universe of potential purchasers" suffices, *id.* at 1551, even if the government "never formally authorized" the addictive product, *Knox*, 759 F. Supp. 2d at 1233.

Jane Doe is the mother of three teenage boys. Doe Decl. ¶ 2. Two of them are addicted to nicotine and have repeatedly tried to stop using nicotine but been unable to do so. *Id.* ¶¶ 3, 6. Ms. Doe reasonably fears that her attempts to help them fight their nicotine addiction will be even more difficult due to the expanded availability of flavored e-cigarettes and nicotine pouches under the 2026 Guidance. *Id.* ¶¶ 16-18. And the increased availability will make it more likely that her youngest son will begin using nicotine products. *Id.* ¶ 9. In either case, she will need to spend even more money on cessation aids, counseling, and health care caused by her children's continued and worsened nicotine addictions. *Id.* ¶¶ 14-15.

Defendants argue that Ms. Doe nonetheless lacks standing because her sons became addicted to nicotine before the Guidance, based on the availability of pre-Guidance products, making it speculative that the proliferation of new unauthorized products will exacerbate or prolong their addictions. *See* ECF No. 86-1 at 13. But Ms. Doe need not show that her children would certainly beat their addiction if the 2026 Guidance were invalidated, nor that they would certainly continue to use tobacco products if it remains in place. It is enough to show that her adolescent sons, who are in the "subgroup Congress identified as most at risk," "will be exposed to" the products. *Pub. Citizen*, 869 F. 2d at 1551. Just as increased exposure to a toxic substance provides standing for injunctive relief even if a plaintiff was previously exposed to some amount of the substance, the increased availability of the products fueling Ms. Doe's sons' addiction increases their risk of harm and constitutes an injury-in-fact. *See, e.g.*, *Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 88 (1st Cir. 2025); *cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

2. Causation

The government does not contradict Plaintiffs' evidence concerning predictable market responses, nor does it dispute that the Organizational and Pediatrician Plaintiffs' injuries are fairly traceable to them. To establish causation, Plaintiffs need only show that "third parties will likely react in predictable ways." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *accord, e.g.*, *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 195-97 (4th Cir. 2026). Plaintiffs have proved not only that the Guidance is *likely* to lead manufacturers and retailers to sell unauthorized products, but that it already has. *See* ECF No. 48-1 at 11-13. Manufacturers have, by their own admission, begun selling new unauthorized products as a "consequence[] of these guidelines,"[10] which they advertise through popular channels like Instagram and sell at major retailers.[11] It is this flood of new unauthorized products allowed by the Guidance—introduced without the information that typically accompanies authorized products—that causes the increased cost and difficulty of providing the Organizational and Pediatrician Plaintiffs' core services, and that increases the risk to Jane Doe's children. Plaintiffs' injuries are therefore fairly traceable to the Guidance.

3. Redressability

Defendants also argue that Plaintiffs' injuries are not redressable because the Court cannot "compel FDA to take enforcement action against any manufacturer of tobacco products—which is ultimately what Plaintiffs seek." ECF No. 86-1 at 13. But Plaintiffs are not asking the Court to compel FDA to take enforcement action; they are asking it to prevent FDA from allowing thousands of new and unauthorized products on the market by giving them a safe harbor from enforcement for an indefinite period, and informing downstream buyers and sellers of the protected products. *See, e.g.*, ECF No. 1 at 40; ECF No. 48-1 at 30. Just as the open assurance that those products can be marketed without fear of enforcement predictably is leading manufacturers and retailers to sell unauthorized products, *see supra* § I.A.2, the withdrawal of that assurance would

[10] Seeking Alpha, *Philip Morris International Inc. (PM) Presents at 23rd annual dbAccess Global Consumer Conference Transcript* (June 2, 2026), https://perma.cc/YE5G-QH45 (statement of PM CEO Jacek Olczak).
[11] *See* ECF No. 48-1 at 12 nn. 16-17 (collecting examples of post-Guidance advertising).

deter them from doing so. The intervenors themselves admit that retailers and other "potential business partners [will be] less willing to rely on the products' regulatory status while review remains pending" if the Guidance is vacated. ECF No. 41-1, Ex. D ¶ 30; *see also, e.g., id.* at Ex. B ¶ 29 ("Where there is an increased risk of enforcement, existing and potential business partners will likely be less willing to work with our members and with [Intervenor AVM's] members and sell their products."); *see also infra* § I.C. The principle that "a party lacks a judicially cognizable interest in the prosecution of another" and courts may not "order[] the Executive Branch to change its arrest or prosecution policies so [it] … initiates more prosecutions," *Texas*, 599 U.S. at 677, is therefore irrelevant: Plaintiffs' harms would be redressed simply by vacatur of the Guidance and its public statement of enforcement safe harbor, and by preventing the issuance of the public list.

Defendants rely solely on *Texas* for their redressability argument. But after restating the principles above, the Court made clear that it was not "suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Id.* at 681. Among the five examples it gave, two are relevant here. First, "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Id.* at 682. And second, "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." *Id.* at 683.

Both examples are relevant here. *See* ECF No. 48-1 at 17-18 (explaining Defendants' abdication of its statutory responsibility); *id.* at 27-28 (explaining that the Guidance "confers new [legal] rights on manufacturers and sellers of e-cigarettes and nicotine pouches"). Defendants dispute Plaintiffs' interpretation of the Guidance on the merits, but that does not matter to the standing analysis. Courts "[a]ssume[] the merits of a dispute will be resolved in favor of the party invoking [the court's] jurisdiction in assessing standing." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). Their counterarguments are wrong for the reasons explained *infra* § II.B, but for standing purposes, they are simply irrelevant.

If the 2026 Guidance is vacated, and FDA is prohibited from publicly announcing that a laundry list of unauthorized products are safe from enforcement, significant numbers of products with pending applications will likely leave or not enter the market, whether or not FDA subsequently decides to take enforcement actions. The intervenors' testimony belies FDA's arguments to the contrary. *See supra* p. 13. To the extent that some products already have entered the market due to the Guidance, many would likely be removed from the market because they would be deprived of their enforcement safe harbor.

Redressability is satisfied where Plaintiffs can show that "[i]nvalidating the [challenged] regulations likely (not certainly, but likely) would make a difference for" Plaintiffs. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 119 (2025); *see also Deal v. Mercer Cty Bd. Of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Plaintiffs need not demonstrate that "the requested relief is certain to redress [Plaintiffs'] injury, especially where some uncertainty is inevitable." *Erwin v. FAA*, 21 F.4th 154, 160 (D.C. Cir. 2021) (quoting *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 117-18 (D.C. Cir. 1990)). Nor must they show that *all* unauthorized products will be sure to leave the market. "[E]ven if reimposition of restrictions would only significantly—rather than completely—redress the appellants' injuries, this would be sufficient to permit judicial review." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 n.17 (D.C. Cir. 1983); *accord, e.g.*, *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 17 (D.D.C. 2018).[12]

[12] Finally, Defendants suggest that Plaintiffs' choice to brief standing in their opposition to Defendants' motion to dismiss, rather than in their affirmative motion for summary judgment, is "reason enough to deny the motion." ECF No. 86-1 at 9. They provide no authority for that proposition—nor could they, as Plaintiffs' standing is plain from the face of their declarations. In cases with consolidated cross-motions, there is nothing unusual about an argument being raised first in a cross-motion and rebutted in response. *See, e.g.*, *Sorrell v. Paige Indus. Servs., Inc.*, No. 21-7062, 2022 WL 684295, at *2 (D.C. Cir. Feb. 11, 2022) (assertion that argument was waived because it was first raised in response to cross-motion for partial summary judgment "misapprehends our forfeiture and waiver doctrine"). This is particularly common in APA cases; indeed, this is how *AAP* proceeded, and FDA made no such argument there. *See AAP*, No. 18-cv-318, Doc. Nos. 31-2, 36-1, 39.

### B. The Guidance Is Not the Exercise of Unreviewable Agency Discretion

Defendants overlook critical aspects of the Guidance to argue that it is an ordinary exercise of enforcement discretion. ECF No. 86-1 at 14-18; *see also id.* at 20 (describing the Guidance as "unexceptional"). But, as Plaintiffs have described, the Guidance "is more than a non-enforcement policy" that might fall under the Executive Branch's traditional grant of enforcement discretion. ECF No. 48-1 at 17 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020)). Rather, the Guidance "created a program for conferring affirmative [] relief," which, as the Supreme Court in *Regents* explained, "provides a focus for judicial review." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 821, 831-32(1985)). To be clear, Plaintiffs do not challenge FDA's decision whether to proceed against any particular manufacturer, but rather challenge FDA's creation of a *categorical* eligibility program through which manufacturers apply for product-specific enforcement treatment, and through which FDA evaluates their products under standardized criteria, communicates the result of the evaluation, and uses and publicizes that result to govern agency and market conduct.

*Regents*, which considered the reviewability of the Department of Homeland Security's Deferred Action for Childhood Arrivals ("DACA") program, is directly applicable. In *Regents*, the Court held DACA was "not simply a non-enforcement policy" because it "did not merely refuse to institute proceedings against a particular entity or even a particular class." *Id.* at 18 (cleaned up). On the contrary, it "establish[ed] a clear and efficient process for identifying [those] who met the enumerated criteria." *Id.* (cleaned up). The agency "solicited applications," "instituted a standardized review process," and "sent formal notices" of the results. *Id.* Together, this process constituted "adjudications." *Id.* DACA was therefore a "program" that was "subject to review under the APA." *Id.* at 19.

So too here. The Guidance sets forth a process for identifying products that meet the established criteria, *see* AR 8 (anticipating that FDA may request information and that, "in many cases," much of it will "already be contained within the manufacturer's pending PMTA [premarket tobacco product application] submission"), that is clear and efficient, *see id.* (requesting

manufacturers "cross-reference" their PMTA to "minimize administrative burden"). It solicits applications, *see id.* (advising that manufacturers "who wish to be included on this list should reach out" to designated agency staff), institutes a standardized review process, *see id.* at 7-8 (FDA will screen for, *inter alia*, "cartoon-like fictional character[s]" or products "resembling a children's toy, phone, or gaming platform"), and sends formal notice of the results, *see id.* at 8 (FDA will create and maintain a public-facing webpage identifying manufacturers and their associated products). Indeed, FDA apparently has already begun to inform companies directly that their products qualify for inclusion. ECF No. 41-1, Ex. D, Ex. 3 (Letter from FDA to Charlie's Chalk Dust LLC identifying 56 e-cigarette products that qualify for the Guidance's safe harbor). Defendants do not attempt to distinguish *Regents* at all.

But even if the Guidance did constitute a mere non-enforcement policy, it would still be reviewable. To the extent Defendants suggest that *Heckler* held that the FDA's enforcement policies are never reviewable, that is not so. *Heckler* maintained that "[t]he FDA's decision not to take the enforcement actions requested by respondents" in that case—*i.e.*, individual enforcement actions against specific drugs—was not subject to judicial review. 470 U.S. at 837-38. *Heckler* left open the possibility that "extreme" policies that "amount to an abdication of [the agency's] statutory responsibilities" might not be "committed to agency discretion." *Id.* at 833 n.4. And as discussed above, *Texas*, on which Defendants principally rely, emphatically rejected the premise that courts may never entertain such cases. 599 U.S. at 681-84. It specifically acknowledged the potential reviewability of "*Heckler*-style 'abdication'" and the *Regents* scenario of "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status." *Id.* at 683. Both exceptions apply: the Guidance provides covered products the benefit of clearance to enter the market illegally without fear of enforcement, enabling review under *Regents*, and it abdicates FDA's statutory responsibility to perform a full scientific review of a product *before* FDA affirmatively allows it to be marketed, enabling review under *Heckler*. *See infra* § II.A.

**C. The Guidance Is Reviewable Final Agency Action**

"The APA embraces a 'strong presumption in favor of judicial review of administrative action.'" *Doe v. Tenenbaum*, 900 F. Supp. 2d 572, 601 (D. Md. 2012), *rev'd on other grounds*, *Co. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014). While the APA limits review to "final agency action," 5 U.S.C. § 704, finality requires only that the action (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) be "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997). The Guidance satisfies both prongs of this "pragmatic and flexible" inquiry. *Rhea Lana, Inc. v. Dep't of Lab.,* 824 F.3d 1023, 1027 (D.C. Cir. 2016).

Defendants do not dispute that the Guidance meets the first prong, and rightfully so. It is not "merely tentative or interlocutory in nature," *Bennett*, 520 U.S. at 178, but instead establishes with finality which categories of e-cigarettes and nicotine pouch products may be freely sold despite lacking the statutorily required premarket authorization order.

The Guidance also satisfies the second finality condition because it "has direct and appreciable legal consequences." *Bennett*, 520 U.S. at 178. "In some circumstances, if the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." *Gen. Elec. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (quotation omitted); *accord Texas v. EEOC,* 933 F.3d 433, 442, 445 (5th Cir. 2019) (holding that guidance telling employers "how to avoid Title VII disparate-impact liability" was reviewable final agency action even though it did not "guarantee[] that the Attorney General will not sue an employer"). Courts "determine whether the guidance has legal consequences based on 'the context and form in which the agency action arises.'" *AAP I*, 379 F. Supp. 3d at 489 (quoting *Philip Morris v. FDA*, 202 F. Supp. 3d 31, 46 (D.D.C. 2016)). As Plaintiffs explained in their opening brief, the Guidance's context and FDA's use of it indicate that "private parties can rely on it as a norm or safe harbor," *Gen. Elec.*, 290 F.3d at 383, and manufacturers and retailers are in fact relying on it as such. *See* ECF No. 48-1 at 11-13, 27-29.

In arguing otherwise, Defendants rely on the Guidance's boilerplate language. The addition of a "disclaimer," however, is not dispositive as to whether a document has legal consequences. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Indeed, multiple courts have already held that *this exact language* is "boilerplate language … [that] cannot dictate whether the … Guidance is a final agency action fit for review." *Philip Morris*, 202 F. Supp. 3d at 46 (analyzing disclaimer that guidance represented FDA's "current thinking," "does not establish any rights for any person and is not binding on FDA or the public," and "do[es] not establish legally enforceable responsibilities . . . and should be viewed only as [a] recommendation[ ]" (alterations in original)); *compare* AR 6 (using identical language). The *AAP I* court considered the same boilerplate disclaimers in the 2017 Guidance. *AAP I*, 379 F. Supp. 3d at 488-89. Rather than giving the disclaimer dispositive weight, the court looked to the 2017 Guidance's impact on the parties and the regulated industry to determine that it was final agency action. *Id.* at 490.

The 2026 Guidance's impact is similar here. As did the 2017 Guidance, the 2026 Guidance has "removed the burden of premarket review" for products meeting its criteria, allowing them to be marketed before the premarket review process is completed, contrary to clear Congressional directives. *AAP I*, 379 F. Supp. 3d at 490. And, like the 2017 Guidance, the current Guidance has imposed a "burden on . . . plaintiffs," *see supra* at § I.A; *AAP I* at 490. The *AAP I* Court found the 2017 Guidance a final agency action because "the agency has completed its decisionmaking process, and . . . the result of that process is one that will directly affect the parties." *Id.* (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992)). The same is true of the 2026 Guidance.

It is already obvious that the regulated industry is paying little attention to the disclaimers relied on by the Defendants. Indeed, if the Guidance really "does not establish any rights for any person" and "is not binding on FDA or the public," it is difficult to account for the intense interest by the industry in intervening in this case. For their part, the manufacturers seeking intervention understand the Guidance to provide "reasonable *assurances* that FDA will not enforce before their applications are resolved." ECF No. 41-1, at 10 (emphasis added); *see also, e.g.*, *id.* at Ex. B ¶ 29 ("If the challenged policy is set aside or restricted, members could lose the treatment FDA has

expressly identified for their products.”); *id.* at Ex. D ¶ 30 (vacatur of the Guidance would “make distributors, retailers, lenders, and potential business partners less willing to rely on the products’ regulatory status while review remains pending”); ECF No. 31-1, at 4 (“If the Court were to set aside the Enforcement Guidance, … UVL’s tobacco-flavored e-liquids could be subject to FDA enforcement action.”); *see also supra* § I.A.3. Plaintiffs have previously provided examples of companies that have introduced new unauthorized products to the market as a direct result of the 2026 Guidance. ECF No. 48-1 at 12. All of this is happening despite FDA’s disclaimer that the Guidance merely represents its “current thinking.” AR 6. The evidence thus shows that “private parties can rely on [the Guidance] as a norm or safe harbor by which to shape their actions,” making it “binding as a practical matter.” *Gen. Elec.*, 290 F.3d at 383.

FDA acknowledges none of this evidence and caselaw, instead relying entirely on *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir. 2002), to suggest that courts cannot look to how regulated entities interpret and rely on an agency document. That case has nothing to do with enforcement guidance and is wholly distinguishable. It involved an EPA report concluding that tobacco smoke is a known human carcinogen. *Id.* at 854. The report was purely informational, designed as “a useful guide to policy makers and citizens.” *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 857 F. Supp. 1137, 1139 (M.D.N.C. 1994). It said nothing about how EPA would enforce its authorities as a result; indeed, the governing statute “explicitly prohibit[ed] the Report from having any regulatory effect.” *Flue-Cured Tobacco*, 313 F.3d. at 858. It did “not act as a permit or carry any comparable legal consequences.” *Id.* at 861. Rather, it only had two effects on anybody’s behavior: it prompted another agency to ban the use of tobacco products in government motor vehicles, and its “persuasive value [could] lead private groups to impose tobacco-related regulations.” *Id.* at 858, 861.

A government research report that said nothing about how the government would implement or enforce the law is fundamentally different from a guidance that establishes a system for companies to apply for protection from enforcement. And, as the *AAP I* court noted in rejecting the same argument, Defendants have not “identified any equivalent provision of the Tobacco

Control Act" that would prevent the Guidance from having "regulatory effect." 379 F. Supp. 3d at 488 (quotation omitted).

The Guidance is also distinguishable from the guidance at issue in *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2019), which "did not tell regulated parties what they must do or may not do in order to avoid liability." *Id.* at 252. That is precisely what the Guidance here does. It identifies concrete steps manufacturers can take to avoid enforcement liability for selling an unauthorized e-cigarette or nicotine pouch, along with limited restrictions that they must avoid to receive its assurances. *See* AR 8 (instructing manufacturers on steps to take to have their products included on the public list of products that will be shielded from enforcement).

Moreover, as Plaintiffs explained previously, ECF No. 48 at 11-12, FDA itself is treating the 2026 Guidance as binding, as evidenced by an amendment to an import alert on unauthorized ENDS products directing that they be detained without physical examination only "in accordance with the FDA's enforcement prioritization framework." FDA, Import Alert 98-07 (Sep. 18, 2026), https://perma.cc/8SY3-PWBK.[13] If field personnel encounter unauthorized e-cigarettes, they cannot detain them or refuse importation until the Center for Tobacco Products "determines whether such ENDS are subject to the [Guidance]." *Id.* Nothing in the Import Alert gives any hint that field personnel or Center for Tobacco Products staff can deviate from the "enforcement prioritization framework."

Nonetheless, FDA asserts that the alert shows that "FDA intends to make case-by-case determinations." ECF No. 86-1 at 19. It is not clear where FDA finds that in the text of the alert. Rather, it appears that FDA is leaning on the Guidance's reservation of authority to "pursue enforcement, on a case-by-case basis, against a particular product," AR 9, which FDA cites

[13] The Guidance also is affecting state enforcement efforts against unauthorized products. For instance, North Carolina has amended its state tobacco registry laws to account for the Guidance. *See* N.C. Gen. Stat. § 143B-245.11(a)(2) (providing for the legal sale of a tobacco product that "is not subject to federal enforcement priority under a published FDA enforcement policy"). Various other states' laws now similarly account for the Guidance. *See* A.C.A. § 20-65-204(b)(1); Code of Ala. § 28-11-17.1(f); La. R.S. § 26: 926.1(G); Miss. Code Ann. § 75-102-2(6); S.C. Code Ann. § 44-95-65(Z); Tenn. Code Ann. 67-4-1034(f).

throughout its brief, *see, e.g.*, ECF No. 86-1 at 17, 21. But despite referencing this line a dozen times, they never actually quote the full sentence: "*Providing this information* does not guarantee that FDA will not pursue enforcement, on a case-by-case basis, against a particular product." AR 9 (emphasis added). The previous paragraph in the Guidance explains what "information" that sentence references and who provides the information. *See* AR 8-9. In order to be placed on the list, manufacturers should "reach out to" an FDA staffer, who will request information from the manufacturer; the manufacturer can then "provid[e] the information directly" or cross-reference the relevant parts of its application submission. AR 8. In other words, the "case-by-case" sentence on which FDA relies so heavily is merely a statement that *providing information to FDA* does not guarantee that FDA won't pursue enforcement. It does not assert that FDA might pursue enforcement if that information meets the Guidance's criteria—much less that it might do so while a product is on the public list. Nor does the Guidance's exception from deprioritization for products with "certain presumptively underage-appealing elements," AR 8, transform the categorical application of the guidance to an individualized determination; to the contrary, it merely creates a categorical carve-out from the Guidance's undifferentiated safe harbor.

Despite FDA's boilerplate disclaimers and Defendants' efforts to minimize the significance of the 2026 Guidance, it is a final agency action subject to judicial review.

## II. The 2026 Guidance Is Contrary to Law and Arbitrary and Capricious in Violation of the APA

An agency action is arbitrary and capricious in violation of the APA if it is not "reasonable and reasonably explained." *Ohio v. EPA,* 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021)). The Guidance is neither.

### A. The Guidance Is Inconsistent with the TCA

Defendants' arguments that the Guidance is consistent with the TCA are largely based on the Guidance's boilerplate language. *See* ECF No. 86-1 at 21 (citing AR 2, 7, 9). But as discussed *supra* at § I.C, the addition of a such language is not dispositive. As explained in Plaintiffs' opening brief, the Guidance directly conflicts with various TCA provisions, including provisions that

mandate *pre*market review of products and those that expressly permit only certain classes of products to be marketed without authorization (and for a limited window of time that has now expired). *See* ECF No. 48-1 at 14-17. The TCA curbs FDA's enforcement discretion and prohibits even a nominal exercise of enforcement discretion where, as here, FDA is "not deciding, on a case-by-case basis, to enforce or not enforce provisions of the Tobacco Control Act" but is rather "not enforc[ing] the premarket review provisions *at all*." *AAP I*, 379 F. Supp. 3d at 493-94. FDA's acknowledgment of the TCA's indisputable legal standards, including that "products on the market without authorization are illegally marketed," AR 7, does not render the Guidance consistent with the TCA; it renders the Guidance knowingly inconsistent with the TCA.

Defendants' attempt to distinguish *Util. Air Regul. Grp. v. EPA* (*"UARG"*), 573 U.S. 302 (2014) brushes aside the facts that make that case relevant. The challenged agency action in *UARG*, as here, was "not just an announcement of [the agency's] refusal to enforce the statutory [] requirements"; rather, the agency "purport[ed] to alter those requirements and to establish with the force of law that otherwise-prohibited conduct will not violate" the statute. *Id.* at 326. Under that framework, the Supreme Court maintained that the government "*cannot* . . . defend the [action] as an exercise of [the agency's] enforcement discretion." *Id.* (emphasis added). For the same reason, FDA cannot defend its Guidance—which does the same, including the public announcement of those products against which it is refusing to enforce statutory requirements—as an exercise of its enforcement discretion.

### B. FDA Provides No Reasonable Explanation of the Criteria for Its Enforcement Safe Harbor

The government's defense of the reasonableness of the Guidance reflects its failure to acknowledge the effect of the Guidance on the marketplace for e-cigarettes and nicotine pouches. FDA has sprinkled the language of "enforcement discretion" throughout the Guidance, but FDA's intended and actual effect is to allow the entry into the marketplace of likely thousands of e-cigarettes and nicotine pouches that have not demonstrated that they are "appropriate for the protection of the public health" as required for new tobacco products under the Tobacco Control

Act. And the criteria in the Guidance that determines which products are granted the privilege to violate the law have nothing to do with the public health objectives of the TCA. Defendants can offer no reasonable explanation for this action because there is none.

That the Guidance creates a safe harbor from enforcement for qualifying unauthorized products is made plain by the provision allowing the qualifying companies and products to be listed on a constantly-updated "public-facing webpage" to "promote transparency to consumers, retailers and other industry stakeholders." AR 8-9. This public list of protected unauthorized products can have no other purpose than to provide assurance to downstream buyers and sellers that they can deal in the affected products without fear of interference by FDA. And that is exactly how manufacturers and retailers have interpreted it. *See supra* § I.C. Contrary to Defendants' account, ECF No. 86-1, that is a "safe harbor."[14]

The primary criterion used to identify the unauthorized products allowed to enter the safe harbor is whether their applications are administratively complete—*i.e.*, have been "accepted and filed" and are thus ready for scientific review. Defendants insist that they "reasonably explain[]" this criterion by noting that FDA receives many applications that "cannot even be accepted or filed because their contents are so lacking" that "FDA cannot begin the analysis required to conduct scientific review . . . ." whereas applications that are both accepted and filed "are more likely to . . . have the information necessary" to determine if the subject products "meet the required standards under the law for granting marketing authorization." ECF No. 86-1 at 26 (quoting AR 7.) This explanation, however, is not connected to the actual action FDA is taking. No number of incomplete applications justifies allowing unauthorized products with more complete—but still unreviewed—applications to enter the market in defiance of the law and to be protected from

[14] Defendants' observation that the list has not *yet* been issued, ECF No. 86-1 at 20 n.4, is no answer. The Guidance provides that "FDA *will* create and maintain a public-facing webpage identifying manufacturers and their associated products that FDA generally does not intend to prioritize enforcement against" under the Guidance. AR 8 (emphasis added). FDA has neither rescinded that portion of the Guidance nor given any other indication that it will not create and maintain the list it describes.

enforcement for an indefinite period into the future. This rationale is particularly arbitrary given FDA's assurance that having a complete application (and thus qualifying for the safe harbor) "in no way has a bearing" on the likelihood of the product ultimately meeting the statutory public health standard for authorization. AR 9.[15]

FDA attempts to rescue the Guidance's insufficient justification by claiming that Plaintiffs misunderstand it. According to FDA, the Guidance is not pursuing the goal of focusing "the oversight associated with enforcement," but rather "regulatory oversight associated with review of premarket applications." ECF No. 86-1 at 27. This only compounds the arbitrariness: the Guidance says nothing at all about how FDA will conduct "regulatory oversight associated with review of premarket applications"—*i.e.*, how it will review and decide applications—and instead functions *only* to offer assurances that there will be no enforcement during that process.

The APA requires an agency to "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962). Here, there is no rational connection between the facts found—the large number of incomplete applications—and the FDA's choice to allow unauthorized products with more complete applications to reach the market and be protected from enforcement. Defendants' assertion that "the Guidance does not 'allow[]' unauthorized products to enter the market illegally," ECF No. 86-1 at 27, simply cannot be reconciled with the plain language of the Guidance. The Guidance has exactly this effect and, as such, is lacking any reasonable justification.

### C. The Guidance Provides No Reasonable Explanation for Changing Its Prior Policy on Unauthorized Flavored Products

The omission of flavors as a criterion for receiving enforcement protection under the Guidance represents a significant unexplained change in FDA policy toward flavored tobacco

[15] Defendants explain that the Guidance "is careful not to prejudge" the more complete applications, ECF No. 86-1 at 26, but allowing the products meeting the criteria of the Guidance to enter the market without authorization *does* prejudge them in a manner expressly disallowed by the TCA.

products, with serious implications for public health. The Guidance is arbitrary and capricious because FDA neither "'display[ed] awareness that it *is* changing position" on flavors nor "offer[ed] 'good reasons for the new policy.'" *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

When Defendants note the Guidance's acknowledgement that FDA is "withdrawing" the April 2020 Guidance, ECF No. 86-1 at 28, they miss the point. The Guidance never acknowledges, nor does it justify, the change in policy toward flavors resulting from withdrawing the 2020 Guidance in favor of the 2026 Guidance. The 2020 Guidance prioritized enforcement against certain kinds of flavored ENDS products because "[e]vidence continues to accumulate, further confirming that youth are particularly attracted to flavored ENDS products." AR 40. The 2026 Guidance allows potentially thousands of unauthorized products to reach the market and receive enforcement protection *regardless of whether they are flavored or not*. The 2026 Guidance represents not only a departure from the treatment of flavors in the 2020 Guidance, but also from FDA's denial of marketing orders for literally millions of flavored e-cigarettes since the 2020 Guidance, *see* ECF No. 48-1 at 7, and from its Draft Guidance on "Flavored Electronic Nicotine Delivery Systems (ENDS) Premarket Applications—Considerations Related to Youth Risk," issued only two months before the 2026 Guidance, in which FDA reiterated the evidence showing that "flavored ENDS products pose a substantial risk to youth." SAR 6. Yet nothing in the 2026 Guidance precludes enforcement protection for flavored products. Indeed, a bubble-gum flavored product could satisfy the criteria for enforcement protection as long as its associated application was sufficiently complete.

Moreover, even if the treatment of flavors in the 2026 Guidance did not represent a change in FDA's flavor policy, the Guidance is arbitrary and capricious because the agency has "entirely failed to consider" the likely impact of the Guidance on youth tobacco use specifically, which is "an important aspect of the problem." *State Farm*, 463 U.S. at 43. As FDA explained just two months before issuing the 2026 Guidance, the agency "has determined that the evidence shows that flavored ENDS pose a substantial risk to youth, and they pose a greater risk to youth than tobacco-flavored ENDS." SAR 6; *see also id.* ("[F]lavors facilitate initiation among youth and

promote established regular ENDS use.") *id.* at 11-13 (summarizing evidence). Yet the 2026 Guidance does not analyze or even acknowledge this issue. Instead, it provides protection from enforcement regardless of flavor, which "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, to say nothing of the change in position from FDA's rationale in denying authorization to millions of flavored e-cigarettes. The 2026 Guidance similarly ignores other important aspects of the problem discussed at length in the Draft Guidance, such as the limitations of advertising and device access restrictions, *id.* at 17-19, and the evidence that manufacturers would need to provide to show that their non-tobacco-flavored products are more beneficial than tobacco-flavored ones, *id.* at 6 ("In order to demonstrate a net public health benefit, ENDS with flavors that pose a higher risk of youth initiation would need to show greater benefits than ENDS with flavors that appeal less to youth."); *see also id.* at 6-8, 13-17.

Defendants assert that "[t]he Guidance applies a conspicuously more stringent standard for enforcement deprioritization to flavored e-cigarettes," citing the requirement in the Guidance that "for nontobacco-flavored products," FDA must have determined that the application also "includes data necessary to evaluate whether such product is appropriate for the protection of the public health." ECF No. 86-1 at 29. But this requirement is not more stringent; it is simply a prerequisite to satisfy the more general requirement in the Guidance that the application have "successfully completed acceptance and filing review," "indicating the application contains sufficient information to support scientific/substantive review . . . ." AR 7 n.7. Indeed, as FDA has previously explained, to find that an application has been "filed," (which is necessary for *any* product to be covered by the Guidance) it must include "'sufficient information' . . . that would allow FDA to determine whether the application demonstrates the marketing of the product would be APPH [appropriate for the protection of the public health]." Premarket Tobacco Product Applications and Recordkeeping Requirements, 86 Fed. Reg. 55,300, 55,381 (Oct. 5, 2021). Defendants further assert that to receive deprioritized enforcement under the Guidance, flavored products must "include robust and reliable evidence that the product helps adults who use combustible cigarettes to switch from those products to e-cigarettes, or significantly reduce their combustible cigarette

use." ECF No. 86-1 at 29 (citing *Wages*, 604 U.S. at 552). But at no point does the Guidance or Administrative Record actually say what Defendants now state is required for a flavored product to receive enforcement protection. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," *State Farm,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)), not on the basis of a *post hoc* litigation position adopted well after the agency action.

Defendants seek to explain its change of policy on flavored products by citing data showing a decline in youth usage of ENDS products between 2022 and 2025. ECF No. 86-1 at 28-29. The APA requires an agency to "cogently explain why it has exercised its discretion in a given manner" and, in determining whether this standard has been met, "the courts may not accept . . . counsel's *post hoc* rationalizations for agency action." *State Farm,* 463 U.S. at 49-50. Not a word about the decline in youth e-cigarette usage appears in the Guidance itself; the data cited by defendants is a classic post-hoc rationalization for agency action.[16]

**D. The Guidance Provides No Reasonable Explanation for the Change in FDA's Interpretation of Its Statutory Authority**

Until the 2026 Guidance, FDA had taken the position that it has no statutory authority to permit the marketing of unauthorized tobacco products with pending applications, even under the guise of "enforcement discretion." *See* ECF No. 48-1 at 24-25. In denying that the agency has changed its position, Defendants misread FDA's 2023 letter denying a Citizen Petition asking the agency to take an action with respect to synthetic nicotine e-liquids identical to the action taken in

[16] Not that the decline in youth usage of these products would justify allowing unauthorized flavored products to be introduced to the market. Indeed, the data cited by Defendants show a sharp increase in youth usage "in the years leading up to the 2020 Guidance," ECF No. 86-1 at 28, which was the period during which FDA had illegally suspended the premarket review requirement. *See generally, AAP I,* 379 F. Supp. 3d 461. The decline in youth usage from 2022 to 2025 on which Defendants rely occurred *after* the previous regulatory safe harbor had ended in late 2021. *See Am Acad. of Pediatrics v. FDA,* 399 F. Supp. 3d 479, 483 (D. Md. 2019) ("*AAP II*"); ECF No. 86-1 at 5. If anything, this suggests that the 2026 Guidance, by allowing unauthorized flavored e-cigarettes to enter the market without FDA authorization, would likely undermine the progress made in reducing youth usage.

the Guidance for all ENDS products and nicotine pouches. After accurately quoting the request made in the Citizen Petition ("that FDA 'exercise enforcement discretion' to 'permit the continued marketing . . . of [certain] synthetic nicotine e-liquids . . . for the duration of the Agency's full scientific review," ECF No. 86-1 at 29 (quoting SAR 65-66)), Defendants ignore the portion of the letter most relevant to the legality of the 2026 Guidance: "To the extent you request that FDA issue a statement of policy to exercise enforcement discretion with respect to certain synthetic nicotine e-liquid products, we deny your request." SAR 67. In support of the denial, the letter cites two "significant issues" with the request. First, "you are requesting that FDA 'permit' manufacturers to market certain synthetic nicotine e-liquid products," an action the letter had previously determined would be "outside of its statutory authority" because "[t]hese products have not received marketing authorization from FDA and thus cannot be legally marketed in the United States." *Id.* Second, the letter cites Judge Grimm's ruling in *AAP I*, characterizing it as vacating "an enforcement discretion policy . . . under which FDA would not intend to initiate enforcement" of the premarket review requirements "until the Agency rendered a decision on the products' application." *Id.* Thus, it is incontrovertible that FDA denied the Citizen Petition because it concluded it lacked legal authority to do precisely what it has done in issuing the 2026 Guidance.[17]

Finally, Defendants entirely overlook more recent statements by FDA officials refusing to allow tobacco products with pending applications to enter the market. These include FDA's 2025 response to the stated intentions of *amicus* R.J. Reynolds Vapor Co. and intervenor Altria subsidiary Helix Innovations to begin marketing e-cigarettes and nicotine pouches even though they lacked marketing authorization but had pending applications, *see* Complaint ¶¶ 60-61, ECF No. 1, and SAR 58, as well as a March 2026 statement by the current Director of FDA's Center for Tobacco Products that state laws permitting the sale of unauthorized products with pending applications are "inconsistent" with federal law. SAR 49-50.

[17] Defendants make much of the fact that the FDA letter cites a different basis for denying the Petitioners' separate request "that FDA refrain from taking enforcement action against specific entities," but that request is hardly analogous to the 2026 Guidance and thus has no bearing on the question of whether that Guidance represents a change in FDA's position on its statutory authority.

Therefore, FDA has wholly reversed its own position on its legal authority to adopt a policy allowing the marketing of unauthorized products with pending premarket applications, a reversal that remains unacknowledged and unexplained.

## III. The Guidance Violates the APA's Notice-and-Comment Requirements and FDA's Statutory and Regulatory Public Participation Requirements

### A. Notice and Comment Was Required

The APA generally requires notice-and-comment rulemaking for legislative (or substantive) rules. 5 U.S.C. §§ 553(b)–(c). Defendants argue that FDA was not required to promulgate the Guidance through notice-and-comment rulemaking because it has no "present binding effect" and therefore is a general statement of policy rather than a legislative (or substantive) rule. ECF No. 86-1 at 22. In making this argument, FDA again relies exclusively on the Guidance's boilerplate language that it "is not binding on FDA or the public" and "does not establish any rights for any person." *Id.* at 22-23. However, as explained, boilerplate disclaimers do not determine whether an agency action has legal effect. *See supra* § I.C; ECF No. 48-1 at 28-29. Courts instead look to the action's "actual function and effect." *Associated Dry Goods Corp. v. EEOC*, 720 F.2d 804, 809 (4th Cir. 1983).

Properly considered, the Guidance plainly has legal consequences and is thus a substantive rule. *First*, it allows the marketing of large numbers of unauthorized e-cigarettes and nicotine pouches, in direct conflict with the plain language of both the TCA and FDA's regulations. *See* 21 U.S.C. § 387j(a)(2); 21 C.F.R. § 1114.5; ECF No. 48-1 at 27-28. As with FDA's 2017 Guidance, the changes that the 2026 Guidance implements to "FDA's statutorily established [premarket review] process" are "tantamount to an amendment to the Tobacco Control Act" (and FDA's regulations). *AAP I*, 379 F. Supp. 3d at 497. As such, the Guidance is a binding substantive rule.

*Second*, FDA's implementation of the Guidance demonstrates that the Guidance limits agency discretion and therefore operates as a substantive rule. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) ("Agency action that. . . narrowly limits administrative discretion constitutes a legislative rule."). As noted *supra* at § I.C, FDA recently

updated its Import Alert to allow detention of e-cigarettes only "in accordance with the FDA's enforcement prioritization framework" and following a determination about "whether such ENDS are subject to the FDA's May 2026 Guidance." FDA, Import Alert 98-07 (Sep. 18, 2026). Nothing in the Import Alert or the Guidance itself supports Defendants' claim that they might still make "case-by-case determinations" as to whether to enforce the TCA's premarket review requirement against products that Defendants have determined comply with the Guidance; the language that Defendants invoke simply says that a product will not receive the safe harbor solely by virtue of *submitting* information. Indeed, the letters that FDA is sending to manufacturers indicate that it "does not intend to prioritize enforcement of the premarket authorization requirement" but "will continue to exercise its existing risk-based approach to enforce requirements against a product or firm that violates *other* provisions in the Federal Food, Drug, and Cosmetic Act for new tobacco products." ECF No. 41-1, Ex. D, Ex. 3 (FDA Letter to Charlie's Chalk Dust) (emphasis added). In other words, FDA will continue applying its usual discretion in determining whether *other* statutory authorities should be enforced against the product, but it has "narrowly limit[ed] [its] administrative discretion" to enforce the premarket review requirement. *Ass'n of Flight Attendants*, 785 F.3d at 717.

Where, as here, "an agency acts as if a document issued at headquarters is controlling in the field" or "it bases enforcement actions on the policies or interpretations formulated in the document, . . . then the agency's document is for all practical purposes 'binding.'" *Appalachian Power*, 208 F.3d at 1021. Indeed, "an agency's conduct applying it" is "more critical[] than the agency's language adopting it." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988). As already explained, FDA's actions confirm that it is applying the Guidance's safe harbor criteria in a binding manner. Nor does it matter to the analysis that the decision to market a product in reliance on the apparent safe harbor is that of "third parties." ECF No. 86-1 at 23 (quoting *Ass'n of Flight Attendants*, 785 F.3d at 717). An agency document is a substantive rule where "it leads private parties . . . to believe" that it will treat it as such. *Appalachian Power*, 208 F.3d at 1021.

### B. Prior Public Participation Was Required

FDA also violated both the FDCA and the agency's own guidance practice regulations by failing to "ensure public participation" prior to implementing the Guidance. 21 U.S.C. § 371(h)(1)(c)(i); *accord* 21 C.F.R. §§ 10.115(c), (g). Such prior public participation is required unless "not feasible or appropriate." 21 U.S.C. § 371(h)(1)(c)(i); *accord* 21 C.F.R. §§ 10.115(c), (g). FDA justified skipping prior public participation by invoking the need to promote transparency, increase efficient resource allocation, promote an orderly transition to a regulated market, and encourage the submission of applications for potentially less harmful products that may be authorized. AR 2; ECF No. 86-1 at 24. Those reasons may explain why FDA wished to issue the Guidance, but they have no bearing on whether prior public participation was not feasible or appropriate. As the Fourth Circuit explained in the analogous APA good-cause context, requiring an agency to articulate its basis for dispensing with public participation "is not a procedural formality but serves the critical purpose of ensuring that the exceptions do not 'swallow the rule.'" *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 766 (4th Cir. 2012). And such exceptions are to be "narrowly construed and only reluctantly countenanced." *Id.* at 767 (quoting *N.J. Dep't of Env'tl Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). FDA's generic invocation of transparency and efficient enforcement does not explain why prior public input was not feasible or appropriate.

Defendants also argue that even if FDA violated its own regulations, *Accardi* requires Plaintiffs to show they were prejudiced by this procedural violation. ECF No. 86-1 at 24-25. But Defendants overlook the distinction drawn in the very case they cite: prejudice is required only when agencies are relaxing "internal housekeeping regulations," not when the underlying agency action is "designed … to benefit outside parties." *City of Fredericksburg v. FERC*, 876 F.2d 1109, 1112 (4th Cir. 1989). FDA's public participation requirements do precisely that: they provide interested parties the opportunity to comment on draft guidance and require FDA to consider those comments before implementation. 21 C.F.R. §§ 10.115(c)(3), (g)(1)(ii), (iv). As such, Plaintiffs were not required to show prejudice.

But even if they were, Plaintiffs have clearly been harmed by FDA's failure to allow for prior public participation. Plaintiffs—public health and medical groups, a pediatrician, and a parent of two children who are addicted to nicotine—possess expertise and first-hand knowledge about the products subject to the guidance as well as their individual and population health effects. *See supra* § I.A. FDA's failure to allow their input deprived Plaintiffs of the opportunity to share critical relevant information with FDA. *See, e.g.*, King Decl. ¶ 20, ECF No. 49-1 at 6 ("Tobacco-Free Kids regularly participates in the regulatory process by communicating to FDA, both informally and through formal comments."). That was prejudicial. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[F]ailure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure.").

Finally, independent of *Accardi*, FDA's failure to provide the statutorily required prior public participation, *see* 21 U.S.C. § 371(h)(1)(C)(i), provides a separate basis for vacating the Guidance as it was issued "without observance of [the] procedure required by law" in violation of 5 U.S.C. § 706(2)(D). And as explained, this violation was not harmless.

## IV. The 2026 Guidance and Public List Are *Ultra Vires*[18]

Defendants' sole argument against Plaintiffs' *ultra vires* claim is that the TCA purportedly does not specifically prohibit action like the Guidance. ECF No. 86-1 at 30-31. As explained *supra* § 2.A, however, the TCA does exactly that: it prohibits FDA from permitting a tobacco product to be marketed before it has issued an order finding that it is "appropriate for the protection of public health." 21 U.S.C. §§ 387j(c)(1)(A), (c)(2); *see* ECF No. 48-1 at 20. Plaintiffs can therefore challenge the Guidance's incompatibility with the TCA through an *ultra vires* claim.

Even if Plaintiffs' statutory *ultra vires* theory were unavailing, however, Defendants fail to reckon with the availability of an *ultra vires* claim on constitutional grounds. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 830 (4th Cir. 2026) ("Nonstatutory review claims alleging a

---

[18] As Plaintiffs explained in their opening brief, the Court need not reach the *ultra vires* claim if it finds that the Guidance is reviewable under the APA. *See* ECF No. 48-1 at 19-20.

constitutional violation, however, are not subject to the same restrictions" as statutory claims). Defendants do not even attempt to distinguish *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023), which found that an ultra vires claim could proceed where the FDA could not identify "even colorable" statutory authority permitting it to make the type of statement at issue. It is a constitutional rule—not a statutory one—that "[a]dministrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam); *cf. Ctr. for Food Safety v. Regan*, 56 F.4th 648, 659 (9th Cir. 2022) (acting beyond authority bestowed by Constitution "undermines the will of the people and ultimately our constitutional structure of government").

## V. Defendants' Arguments About Remedy Are Meritless

As a last resort, Defendants ask this Court to limit the remedy or forgo it altogether should it rule for Plaintiffs. Neither of its arguments has any merit.

Defendants first request that the Court refrain from vacating the Guidance and public list under the D.C. Circuit decision *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150 (D.C. Cir. 1993). They fail to mention that the Fourth Circuit "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. U.S. Army Corps of Eng'rs.*, 909 F.3d 635, 655 (4th Cir. 2018). Nor do they acknowledge that "vacatur is the only permissible remedy when the agency decision is contrary to law, the agency entirely failed to consider an important aspect of the problem, or the agency offered an explanation counter to the record," *Sierra Club v. Nat'l Marine Fisheries Serv.*, 797 F. Supp. 3d 440, 493 (D. Md. 2024) (citations omitted), all of which Plaintiffs have shown here. *See* ECF No. 48-1 at 14-17 (contrary to law); *id.* at 23-24 (failure to consider important aspect of the problem and contrary to the record made by the agency two months earlier in March 2026 Draft Guidance). Nor do they acknowledge that even courts that accept *Allied-Signal* treat a lack of notice and comment as "a fundamental flaw that normally requires vacatur of the rule," with "[t]he most egregious" being "cases in which a government agency seeks to promulgate a rule by another name." *Nat. Res. Def. Council v.*

*Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) and *Allina Health Care Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014)); *accord, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) ("[A]n agency that bypassed required notice and comment rulemaking obviously could not ordinarily keep in place a regulation while it completed that fundamental procedural prerequisite.").

Their request thus fails at the outset. But even if they made it to the second requirement for *Allied-Signal*, serious "disruptive consequences of vacatur," *Allied-Signal*, 988 F.2d at 150, they would fail. Defendants merely "rest[] … on the regulatory uncertainty that typically attends vacatur of any rule," which does not satisfy the test. *Wheeler*, 955 F.3d at 85; *see* ECF No. 86-1 at 32 (citing "confusion and associated inefficiencies" as the only disruptive consequences). This is not a case where vacatur would threaten rolling blackouts, *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 101 (D.D.C. 2019), or "cost hundreds of millions of dollars," *Appalachian Voices v. Tenn. Valley Auth.*, --- F.4th ----, 2026 WL 3093507, at *9 (6th Cir. Oct. 16, 2026). The only "disruption" here would be to manufacturers and retailers of concededly unlawful products, who would lose their promised safe harbor. It would certainly not shut down the e-cigarette and nicotine pouch markets as a whole; the dozens of products that FDA has authorized would be completely unaffected. And, in any event, "[t]he Fourth Circuit has ordered vacatur without regard to how disruptive that remedy would be." *Sierra Club*, 797 F. Supp. 3d at 493.

Finally, Defendants cite *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), to argue that the APA does not authorize "universal vacatur." ECF No. 86-1 at 32. Yet *CASA* explicitly stated that it was *not* reaching that conclusion. *See* 606 U.S. at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."); *id.* at 873 (Kavanaugh, J., concurring) ("Going forward, ... district courts will grant or deny the functional equivalent of a universal injunction ... by preliminarily setting aside or declining to set aside an agency rule under the APA."). Although the government has made this

argument numerous times since *CASA*, it has been roundly rejected, both by appellate courts[19] and courts in this district.[20] As Judge Gallagher explained, "the APA has always expressly authorized vacatur, and *CASA* did not change that." *Am. Fed'n. of Tchrs.*, 796 F. Supp. 3d at 119. Congress's explicit direction that courts "*shall* … hold unlawful and set aside" permits no other reading. *Id.* at 120 (quoting 5 U.S.C. § 706(2)). The government's newfound view "would be a radical change in administrative law, and inconsistent with the text and history of the APA." *Id.*

Even if available, a narrower remedy would be infeasible in this case. Defendants do not suggest any way in which the Court could "afford the plaintiff[s] complete relief," as *CASA* and long-standing principles of equity require. 606 U.S. at 851. FDA asks the Court to "merely set aside the Guidance as to Plaintiffs," ECF No. 86-1 at 32, but it does not even try to suggest how that could be done, much less how it would afford complete relief to the Plaintiffs. Plaintiffs' harms stem from the widespread marketing of unauthorized products that are proliferating due to the Guidance's assurances. *See supra* § I(A). Plaintiff-specific relief would leave the unlawful assurances in place, forcing Plaintiffs to incur the costs associated with adapting their core activities, including counseling services, to the flood of products that they are causing. Defendants' undefined "limited" remedy would necessarily be no remedy at all.

**CONCLUSION**

For the foregoing reasons, and the reasons in Plaintiffs' Memorandum in Support of Summary Judgment, the Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment.

---

[19] *See, e.g.*, *R J Reynolds Tobacco Co. v. FDA*, 189 F.4th 432, 448 (5th Cir. 2026); *NicQuid, LLC v. FDA*, 188 F.4th 790, 799-800 (5th Cir. 2026); *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981-82 (9th Cir. 2026); *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (per curiam); *see also Florida v. HHS*, No. 25-12095, 2026 WL 2618386, at *8 n.9 (11th Cir. Sept. 4, 2026).

[20] *See, e.g.*, *Asylum Seeker Advoc. Project v. USCIS*, 808 F. Supp. 3d 708, 722 (D. Md. 2025); *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 176 (D. Md. 2025); *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119-22 (D. Md. 2025); *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700, 730 n.20 (D. Md. 2025).

Dated: November 20, 2026

Respectfully submitted,

Dennis A. Henigan*
Connor Fuchs*
Andrew Tardiff (Bar No. 32504)

CAMPAIGN FOR TOBACCO-FREE KIDS
1400 I Street NW, Suite 1200
Washington, DC 20005
Tel: (202) 296-5469
dhenigan@tobaccofreekids.org
cfuchs@tobaccofreekids.org
atardiff@tobaccofreekids.org

* Admitted *pro hac vice*

*/s/ Mark B. Samburg*
Jeffrey B. Dubner*
Mark B. Samburg (Bar No. 31090)
Carrie Y. Flaxman*
Elena S. Goldstein (Bar No. 31738)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
jdubner@c.democracyforward.org
cflaxman@democracyforward.org
egoldstein@democracyforward.org

*Attorneys for Plaintiffs*